Shelaine M. THOMPSON, Appellant,

v.

UNITED PARCEL SERVICE, Appellee.

No. S–8376.

Supreme Court of Alaska.

Feb. 5, 1999.

Charles W. Coe, Anchorage, for Appellant.

Joseph A. Pollock and Shelby Nuenke–Davison, Davison & Davison, Inc., Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Shelaine M. Thompson left her full-time job as a cargo handler for MarkAir when it went bankrupt. She started working for United Parcel Service (UPS), which classified her, like all UPS air rampers, as a part-time employee. After only two weeks at UPS, Thompson injured her knee while working. Alaska Statute 23.30.220 contains a formula for determining workers' compensation awards based on the prior work history of the injured employee. Believing it unfair to compensate Thompson based on prior full-time work since UPS classified her as part-time, the Alaska Workers' Compensation Board deviated from the statute and lowered Thompson's disability award. Because UPS did not show that application of the statutory formula was arbitrary and unfair as applied to Thompson, we reverse and remand to the Board for redetermination of Thompson's award.

### II. FACTS AND PROCEEDINGS

Shelaine M. Thompson worked full-time as an air cargo handler for MarkAir in 1993 and 1994. During those years she earned an annual salary of $25,050.59 and $28,142.08, respectively, including overtime. When MarkAir declared bankruptcy in 1995, Thompson began working for UPS in a permanent part-time hourly position as an air ramper earning $8.00 an hour. All UPS employees, with the exception of management and truck drivers, are classified as permanent part-time employees; they receive full-time benefits but generally work five-day work weeks averaging between three hours and four and a half hours each day.

UPS employees may work a double shift and occasionally work over eight hours a day—enough to qualify for overtime pay. But an employee who "double shifts" is guaranteed neither overtime nor an eight-hour day. The availability of second shifts is determined by seniority. Thompson maintained that she intended to work as many double shifts as possible in order to sustain a salary comparable to the one she received at MarkAir. She also investigated obtaining additional part-time employment; she applied for jobs at the United States Postal Service and Alaska Airlines. Because UPS could not guarantee full-time hours, many workers on Thompson's shift similarly worked double shifts, other part-time jobs, or both.

On August 3, 1995, only two weeks after starting work at UPS, Thompson injured her knee when her leg fell through the grating of an aircraft she was unloading. Although Thompson's hours were not restricted for medical reasons, she was released back to work on August 15 with instructions that she perform light duty for three weeks.

During the two weeks prior to the accident, Thompson spent one full week in training but still managed to double shift enough to earn overtime on two occasions during the second week. After the accident, Thompson continued working at UPS until December 1, 1995, but in a less physically demanding position. In the months following the accident, Thompson did some double shifting but only managed to qualify for overtime two more times, both while working light duty. According to Thompson, her physician told her to work at her own pace and restricted her from working on her knees, as required of cargo handlers working in the bellies of cargo jets. Thompson attended a training course at Alaska Airlines but was never offered a position there; she claims this is because she was no longer capable of performing the work. She was offered a position with the Postal Service, but the offer was withdrawn when a Postal Service doctor discovered Thompson's knee injury.

In December 1995 Thompson voluntarily left UPS for personal reasons unrelated to her injury. On February 20, 1996, Thompson had arthroscopic surgery on her knee. She was unemployed and sought no work between the time she left UPS and had the surgery. After the surgery, Thompson remained unemployed until switching professions and beginning work for GCI as a warehouse specialist on May 1.

UPS paid Thompson's medical and rehabilitation bills and Temporary Total Disability (TTD) benefits while she recovered from surgery—a seven-week period running from February 20 to April 9. UPS calculated the TTD benefits to be $154 a week for a total of $1,100, based on Thompson's total gross earnings at UPS.

On February 26, 1996, Thompson filed an Application for Adjustment of Claim to increase her compensation rate to reflect her full-time earnings at MarkAir. UPS controverted Thompson's claim. The parties differed as to how to interpret AS 23.30.220(a),[1] the statute governing the calculation of the TTD benefits.

The Workers' Compensation Board heard the matter, including Thompson's claim for attorney's fees and costs, on September 17, 1996. Thompson argued that under the 1995 amendments to the governing statute,[2] the

---

**1.** At the time Thompson was injured, AS 23.30.220 read in relevant part:

(a) The spendable weekly wage of an injured employee at the time of an injury is the basis for computing compensation. It is the employee's gross weekly earnings minus payroll tax deductions. The gross weekly earnings shall be calculated as follows:

(1) the gross weekly earnings are computed by dividing by 100 the gross earnings of the employee in the two calendar years immediately preceding the injury;

(2) if the employee was absent from the labor market for 18 months or more of the two calendar years preceding the injury, the board shall determine the employee's gross weekly earnings for calculating compensation by considering the nature of the employee's work and work history, but compensation may not exceed the employee's gross weekly earnings at the time of the injury. . . .

**2.** Legislative changes to AS 23.30.220 became effective September 4, 1995, about a month after Thompson's injury. The statute now reads in relevant part:

(a) Computation of compensation under this chapter shall be on the basis of an employee's spendable weekly wage at the time of injury. An employee's spendable weekly wage is the employee's gross weekly earnings minus payroll tax deductions. An employee's gross weekly earnings shall be calculated as follows:

(1) if at the time of injury the employee's earnings are calculated by the week, the weekly amount is the employee's gross weekly earnings;

(2) if at the time of injury the employee's earnings are calculated by the month, the employee's gross weekly earnings are the monthly earnings multiplied by 12 and divided by 52;

(3) if at the time of injury the employee's earnings are calculated by the year, the employee's gross weekly earnings are the yearly earnings divided by 52;

(4) if at the time of injury the

(A) employee's earnings are calculated by the day, hour, or by the output of the employee, the employee's gross weekly earnings are the employee's earnings most favorable to the employee computed by dividing by 13 the employee's earnings, not including overtime or

compensation rate should have been based on her best thirteen weeks of the fifty-two weeks prior to the injury. In the alternative, she argued the same amount would be reached using the old version of AS 23.30.220(a)(1). That calculation would incorporate salary from MarkAir and would have reflected her intention to work double shifts and seek part-time work elsewhere to supplement the part-time salary that all UPS workers receive. Under this measure, Thompson calculated her weekly gross earnings to be $531.92.[3]

UPS contended that, according to *Gilmore v. Alaska Workers' Compensation Board,*[4] applying § 220(a)(1) to Thompson would be unconstitutional because the award would not be fair to both employee and employer. UPS argued that basing the compensation rate on Thompson's MarkAir full-time salary when she only worked part-time at UPS would be unfair. Thus UPS urged the Board to use the alternative method of calculating the TTD rate under § 220(a)(2)—gross earnings at time of injury. Under that measure, UPS calculated Thompson's weekly gross earnings to be $181,[5] yielding a TTD benefit of $154.

The Board agreed with UPS, finding the differences in these measures to be substantial and holding that Thompson's calculation of $531.92 did not accurately reflect her future earning potential:

> [A]fter the period to which the AS 23.30.220(a)(1) formula applies, the employee changed from working full-time to working part-time. We find double shifting was the exception more than the rule. ... [T]he double shift work went to employees on a seniority basis, and as a new hire, [ ] the employee was not part of that group. Also [the UPS employee supervisor] reviewed the employee's records and found she only worked double shift[s] on four occasions.

After examining the nature of Thompson's work and work history, the Board adopted UPS's calculation under § 220(a)(2), concluding:

> As we found previously, after the employee left employment with Mark Air, she went from full-time to part-time work for a period of approximately 20 weeks. Whether this change was brought about by economic factors or the employee's desires, it reflects that during the period of disability (February 20, 1996—April 10, 1996), it would have been highly unlikely the employee would have worked full-time with the earnings she previously made with Mark Air.

Because it denied Thompson's claim for a TTD rate increase, the Board also denied and dismissed Thompson's claims for attorney's fees and costs.

Thompson appealed to the superior court, which affirmed the Board's denial of a TTD rate increase. Thompson appeals.

## III. DISCUSSION

### A. Standard of Review

■■■ This court independently reviews the merits of an agency determination and does not defer to the decision of a superior

premium pay, earned during any period of 13 consecutive calendar weeks within the 52 weeks immediately preceding the injury;

(B) employee has been employed for less than 13 calendar weeks immediately preceding the injury, then, notwithstanding (I)–(3) of this subsection and (A) of this paragraph, the employee's gross weekly earnings are computed by determining the amount that the employee would have earned, not including overtime or premium pay, had the employee been employed by the employer for 13 calendar weeks immediately preceding the injury and dividing this sum by 13;

(5) if at the time of injury the employee's earnings have not been fixed or cannot be ascertained, the employee's earnings for the purpose of calculating compensation are the usual wage for similar services when the services are rendered by paid employees;

. . . .

(7) when the employee is working under concurrent contracts with two or more employers, the employee's earnings from all employers are considered as if earned from the employer liable for compensation.

**3.** ($25,050.59 + $28.142.08)/100.

**4.** 882 P.2d 922 (Alaska 1994).

**5.** UPS used the following calculation: ($3,570.72/138) × 7—(income earned/# days worked) × (seven days in a week).

court acting as an intermediate court of appeal.[6] In reviewing an agency's factual findings, we employ the "substantial evidence" test.[7] Substantial evidence is

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The Board's decision need not be the only possible solution to the problem, for it is not the function of the court to reweigh the evidence or choose between competing inferences, but only to determine whether such evidence exists.[8]

When an agency decision involves expertise regarding either complex subject matter or fundamental policy formulation, this court defers to the decision "so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion."[9] The substitution of judgment test is "used for questions of law where no agency expertise is involved."[10] This is especially true in the context of "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience."[11]

### B. The Version of AS 23.30.220(a) in Effect at the Time of the Injury Applied to Thompson.

Under AS 23.30.185, TTD benefits are calculated by taking eighty percent of an injured employee's "spendable weekly wages." Alaska Statute 23.30.220(a), defining spendable weekly wages, is the substance of this appeal. A threshold question is whether we apply the 1995 amendments, effective one month after Thompson was injured, or the 1988 version of AS 23.30.220(a), the law in effect at the time of the injury. Thompson argues that we should apply the 1995 amended version; UPS urges that we look to the law in effect when Thompson was injured.

We presume that statutes only have prospective effect "unless a contrary legislative intent appears by express terms or necessary implication."[12] We have previously applied the version of AS 23.30.220 that existed at the time of injury, despite subsequent amendments.[13] And since the 1995 amendments to AS 23.30.220 evidence no intent that the provision be applied retrospectively, the Board has applied the 1988 version of AS 23.30.220(a) to cases where the injury occurred—like Thompson's—prior to September 4, 1995.[14] We see no reason to disagree with the Board's rulings. Thus, the Board correctly determined that the applicable law was the version of AS 23.30.220 in effect at the time of Thompson's injury.

### C. Under Gilmore, a Party Must Show Substantial Evidence that Past Wages Are Inaccurate Predictors of Losses from Injury in Order to Justify Deviating from AS 23.30.220(a)(1).

UPS reads Gilmore v. Alaska Workers' Compensation Board[15] to mean that "the Board was required to determine what was fair, both as to the employee and the employer." Because the Gilmore decision rested on principles of constitutional law, we review its interpretation under a substitution

---

**6.** See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992) (citation omitted).

**7.** Jager v. State, 537 P.2d 1100, 1107 (Alaska 1975).

**8.** Interior Paint Co. v. Rodgers, 522 P.2d 164, 170 (Alaska 1974) (footnotes and internal citation omitted).

**9.** See Ellis v. State, Dep't of Natural Resources, 944 P.2d 491, 493 (Alaska 1997) (quoting Kodiak W. Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc., 592 P.2d 1200, 1203 n. 7 (Alaska 1979)).

**10.** Bruner v. Petersen, 944 P.2d 43, 47 n. 5 (Alaska 1997) (citation omitted).

**11.** Earth Resources Co. v. State, Dep't of Revenue, 665 P.2d 960, 965 (Alaska 1983) (quoting Kelly v. Zamarello, 486 P.2d 906, 916 (Alaska 1971)).

**12.** Pan Alaska Trucking, Inc. v. Crouch, 773 P.2d 947, 948 (Alaska 1989).

**13.** See Phillips v. Houston Contracting, Inc., 732 P.2d 544, 545–46 (Alaska 1987); Johnson v. RCA–OMS, Inc., 681 P.2d 905, 906 & n. 2 (Alaska 1984).

**14.** See, e.g., Reiter v. C.-Express Moving & Storage, 1996 WL 444404 at *3 (Alaska Work.Comp.Bd. May 9, 1996).

**15.** 882 P.2d 922 (Alaska 1994).

of judgment standard.[16] We decline to adopt the broad reading of *Gilmore* advocated by UPS.

*Gilmore* concerned the application of AS 23.30.220(a) to an employee who worked for only thirty-nine weeks in the one hundred weeks prior to his injury. We found in *Gilmore* that AS 23.30.220(a) violated the equal protection clause of the Alaska Constitution. We noted that the

> gross weekly wage determination method of AS 23.30.220(a) creates large differences in compensation between similarly situated injured workers, bears no relationship to the goal of accurately calculating an injured employee's lost wages for purposes of determining his or her compensation, is unfair to workers whose past history does not accurately reflect their future earning capacity, and is unnecessary to achieve quickness, efficiency, or predictability.[17]

But *Gilmore* held that AS 23.30.220(a) was unconstitutional as applied, not facially unconstitutional. We noted that "section 220(a) may be applied constitutionally in a number of circumstances, for example, where an injured worker has had the same occupation for all of the past two calendar years." [18] Gilmore's case was not such a circumstance. If he had worked either more or less in the two calendar years preceding his injury, his award would have been substantially higher than the amount he received under the AS 23.30.220(a) formula.[19]

In order to determine whether AS 23.30.220(a) could be constitutionally applied to a particular employee, *Gilmore* focused on the predictability of past wage levels. Accordingly, the first question under *Gilmore* is not whether an award calculated according to AS 23.30.220(a)(1) is "fair." Rather, it is whether a worker's past employment history is an accurate predictor of losses due to injury. UPS is correct, as a general matter,

that if past wage levels have no rational tendency to show earning capacity, application of the AS 23.30.220(a)(1) formula may be unfair to either employer or employee. But where past wage levels *are* accurate predictors, the Board must apply the statutory formula. The decision to depart from the statute must be based on substantial evidence supporting the conclusion that past wage levels will lead to an irrational workers' compensation award. The Board erred here when it conducted a generalized fairness inquiry rather than asking whether Thompson's past earnings could accurately be used to determine what she would have earned had she not been injured.

The Board first determined that there was a "substantial difference" between Thompson's award under AS 23.30.220(a)(1) and her gross weekly earnings at the time she was injured. The Board concluded that, solely due to the disparity, "computation of GWE under the formula does not accurately reflect the employee's future earning capacity" and then deviated from the statutory formula. This analysis puts the cart before the horse; the disparity is only relevant *if* past wages do not accurately predict future earning potential. The disparity does not per se indicate a lack of predictive value.

■ In fact, a primary purpose of our workers' compensation laws is to predict accurately what wages would have been but for a worker's injury. In *Johnson v. RCA–OMS, Inc.*,[20] we explained that under past versions of the statute at issue here, the "entire objective of wage calculation is to arrive at a fair approximation of claimant's probable future earning capacity." [21] We reiterated this theme in *Gilmore* with regard to the 1988 version of the statute involved in

---

**16.** *See Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997); *Earth Resources Co. v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983) (quoting *Kelly v. Zamarello*, 486 P.2d 906, 918 (Alaska 1971)).

**17.** *Gilmore*, 882 P.2d at 929.

**18.** *Id.* at 930 n. 17.

**19.** *See id.* at 925 n. 8.

**20.** 681 P.2d 905 (Alaska 1984).

**21.** *Id.* at 907 (quoting 2 Larson, *The Law of Workmen's Compensation* § 60.11(d) at 10–564 (1983)); *see also State Dep't of Transp. & Pub. Facilities v. Gronroos*, 697 P.2d 1047, 1049 (Alaska 1985).

this case when we quoted *Johnson* with approval.[22]

D. *The Board Lacked Substantial Evidence to Depart from the Statutory Formula in Determining Thompson's Award.*

 Because UPS seeks deviation from the statutory formula in the calculation of Thompson's disability award, UPS carries a heavy burden. UPS must show that the application of AS 23.30.220(a)(1) is irrational as a measure of earning capacity. Since the question of the reliability of Thompson's past work history as a predictor is factual in nature, we review the issue under the substantial evidence test,[23] viewing whether the evidence relied upon was substantial in light of the record as a whole.[24]

The Board here failed to consider several crucial facts in its determination that Thompson's award should not be calculated under AS 23.30.220(a)(1). Although the Board accurately noted that Thompson had recently moved from full-time to part-time work, it treated this decision as indicative of an intent to make a lifestyle change. Yet despite the Board's assertion that Thompson may have switched to part-time employment due to her own desire, *all* the evidence indicates that Thompson moved to a part-time position only because her previous employer went out of business and the only positions at UPS for workers in her job category were classified as part-time. Rather than earn only a part-time wage, she intended to work double shifts in order to obtain the functional equivalent of full-time work. Thompson testified that she wanted to "double shift every day to

try to make a 40–hour week, so that ... I would be able to ... compensate from going from a higher-paying job."

Alternatively, Thompson intended to obtain other part-time cargo handling work to make up the difference between her MarkAir salary and that at UPS. These intentions were frustrated only by her injury. Thompson completed a training course at Alaska Airlines but could no longer perform the work after the accident. She was offered a job with the Postal Service but could not take it when a Postal Service physical examination revealed her recent knee injury. And since moving to a desk job at GCI, Thompson has continued to work full-time, including overtime. The Board had no contrary evidence before it. Thompson, quite simply, is not the worker we hypothesized in *Gilmore's* footnote 13 when we stated that the statutory formula might overcompensate a worker who recently moved from full-time to part-time work.[25]

The Board declined to give weight to Ms. Thompson's intent to double shift because "double shifting was the exception more than the rule" and because it was allocated on a seniority basis, placing Thompson at the end of the line for availability. But the Board made no mention in its decision of Thompson's intent to work in another part-time job along with her work at UPS. UPS urges that reliance on Thompson's intentions is "far too speculative and had little correlation to the existing factual circumstances." We have recognized, however, that "intentions as to employment in the future are relevant to a determination of future earning capacity" in determining proper compensatory awards.[26]

---

22. *Gilmore*, 882 P.2d at 927.

23. *See Jager v. State*, 537 P.2d 1100, 1107 (Alaska 1975).

24. *See Delaney v. Alaska Airlines*, 693 P.2d 859, 863 & n. 2 (Alaska 1985) (citing *Keiner v. City of Anchorage*, 378 P.2d 406 (Alaska 1963)), *overruling on other grounds recognized in Yahara v. Construction & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993).

25. *See* 882 P.2d at 928 n. 13. Indeed, that footnote refers to *State Department of Transportation & Public Facilities v. Gronroos*, 697 P.2d 1047 (Alaska 1985), a case in which we overturned the

Alaska Workers' Compensation Board's award of compensation based on year-round wage calculations for a seasonal worker. *See id.* at 1049. Unlike Thompson, Gronroos "found that the seasonal job was ideal for his circumstances" because it "supplemented his retirement income, yet permitted him vacation time in Hawaii." *Id.* at 1048. This is the type of situation in which a move to part-time work justifies a finding that past earnings are not indicative of future earning potential; Thompson's situation stands in marked contrast.

26. *Gronroos*, 697 P.2d at 1049 n. 2 (citing *Vetter v. Alaska Workmen's Compensation Board*, 524 P.2d 264, 266 (Alaska 1974)).

 

Moreover, the Board seems to have used Thompson's lack of double shifting *after* her injury as a factor in determining her earning capabilities. The Board found that UPS's employee relations supervisor "reviewed the employee's records and found she only worked double shift on four occasions."[27] But this analysis fails to account for the fact that Thompson was injured after only two weeks at UPS, one of which was spent in training. Limited working hours following injury are not particularly relevant to a determination of a worker's probable work patterns had no injury been sustained.

In light of the fact that the Board refused to consider Thompson's supplemental part-time job options and appeared to use her lack of overtime pay following the injury to determine her earning potential, we cannot say that there exists "substantial evidence in light of the whole record that a reasonable mind might accept as adequate to support the board's conclusion."[28] Accordingly, we hold that the Board lacked the proper evidentiary basis to justify its departure from the statutory formula. UPS has not met its burden of showing that application of subsection (a)(1) inadequately predicted Thompson's probable wages had she not been hurt on the job.

### E. *Attorney's Fees*

Because we reverse, Thompson is entitled to receive reasonable attorney's fees and legal costs pursuant to AS 23.30.145.

## IV. CONCLUSION

The Board was correct to apply the version of AS 23.30.220(a) in effect at the time of the injury. But its determination that Thompson's past wages were an insufficiently accurate predictor of the losses caused by her injury was unsupported by substantial evidence, and thus the Board should not have deviated from the statutory formula. We REVERSE and REMAND to the Board to award Thompson compensation calculated under the formula in AS 23.30.220(a)(1) as well as reasonable attorney's fees and costs.

---

27. This finding of fact, as well as being misleading, is also inaccurate. In fact, the UPS supervisor testified that Thompson double shifted enough to lead to four *overtime* periods, not four double shifts. Since a worker in Thompson's position would work only between 15 and 22.5 hours a week without double shifting, and overtime is work over eight hours a day (forty hours a week), this is a significant difference. To the extent that this particular finding is the basis for the Board's holding, then, that holding is completely unsupported by the evidence.

28. *Delaney v. Alaska Airlines*, 693 P.2d 859, 863 (Alaska 1985), *overruling on other grounds recognized in Yahara v. Construction & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993).