Bruce Wayne WILLIAMS,
Appellant/Cross–
Appellee,

v.

Patrick ABOOD, d/b/a Knik Sweeping
Company and Providence Washington
Insurance, insurer, Appellees/Cross–Ap-
pellants.

Nos. S–9806, S–9836.

Supreme Court of Alaska.

Aug. 16, 2002.

Charles W. Coe, Law Offices of Charles W. Coe, Anchorage, for Appellant/Cross–Appellee.

Patricia L. Zobel and John D. Harjehausen, DeLisio Moran Geraghty & Zobel, Anchorage, for Appellees/Cross–Appellants.

Toby N. Steinberger, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska, Department of Labor, Workers' Compensation Board.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

---

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Bruce Wayne Williams sustained a knee injury while working as a driver of a street sweeper for Knik Sweeping Company on August 21, 1992. The Workers' Compensation Board resolved several disputed issues; Williams appealed the board's decision to the superior court. Williams appeals several aspects of the superior court's decision affirming the board's rulings, and Knik cross-appeals the decision by the superior court to remand the issue of attorney's fees for Williams's first attorney, Darryl Jones, to the board. We affirm the board in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

On August 21, 1992, Bruce Williams injured his left knee while on the job driving a street sweeper for Patrick Abood, d/b/a Knik Sweeping Company.[1] Immediately after the accident, Williams received emergency care and subsequently began seeing Dr. Robert Gieringer. Williams underwent several arthroscopic surgeries, including a patellectomy[2] and reconstruction on January 20, 1994. During this surgery, Williams's patella was wired together. Knik accepted the workers' compensation claim and provided medical benefits and Temporary Total Disability (TTD) at a rate of $162.39 per week.

Williams's compensation rate was determined using the version of AS 23.30.220(a)(1) in effect at the time of Williams's injury. The compensation rate was based on wage and tax records provided by Williams for 1990 ($5,133.00) and 1991 ($19,758.75), yielding gross weekly earnings of $249.00. Dr. Gieringer found that Williams was medically stable on April 5, 1994 and that he had a Permanent Partial Impairment Rating (PPI) of eighteen percent. Williams was released to return to work, and Knik paid him a lump-sum of $21,098.60 in PPI benefits on April 13, 1994.

---

1. For the purpose of clarity, the employer and the insurance company will collectively be referred to as Knik.

2. A patellectomy is the excision, or removal, of the patella, commonly referred to as the kneecap. STEDMAN'S MEDICAL DICTIONARY 1149 (25th ed.1990).

Williams changed doctors and started treatment with Dr. David A. McGuire. On May 9, 1995 Williams underwent another surgery to remove the wire around his patella. Knik reinstated TTD benefits effective May 9, 1995. Williams continued to be in pain, and underwent yet another surgery in which Dr. Harold Dunn performed a total knee replacement on March 5, 1997. Williams also underwent interdisciplinary physical rehabilitation and narcotics weaning at the University of Utah from March 1, 1997 to May 7, 1997.

On May 27 Williams was admitted to Providence Alaska Medical Center's mental health unit for suicidal ideation. Williams was released from this facility on June 9, 1997 by his treating psychiatrist, Dr. Cleve R. Shirey. Dr. Shirey diagnosed Williams with major depression, pain disorder, cannabis abuse, iatrogenic narcotic dependency,[3] personality disorder not otherwise specified, several psycho-social and physical problems, and a global assessment of functioning[4] (GAF) rating of seventy. On June 4 there was a teleconference between the parties, their attorneys, and the health-care professionals in charge of Williams's care to coordinate narcotic pain management. Everyone involved agreed to wean Williams off narcotics, as much as possible, through a series of "blind" pain cocktail dosages.

Williams hired attorney Darryl Jones to represent him in a variety of claims against Knik. On July 2 the parties entered into a "Partial Compromise and Release" that was approved by the Workers' Compensation Board and signed by Williams and both attorneys. The compromise and release identified disputes between the parties over medical travel expenses, prescription reimbursement, payment for a Jacuzzi, lounge chair, and sauna, penalties for bad faith controversion, and interest. The compromise and release waived Williams's claims for medical benefits, travel expenses, penalties, interest, and frivolous controversion prior to July 1, 1997 in exchange for $9,000 plus $1,150 in reasonable attorney's fees.

Also on July 2 Williams and his attorney signed a separate "Release and Settlement Agreement" dealing with issues of bad faith. In the release and settlement, Williams released Knik from all claims of bad faith under statute and tort law for actions through July 2, 1997 in exchange for $11,500 and $1,350 in attorney's fees.

On July 28 Dr. Dunn released Williams to vocational rehabilitation and Knik requested reemployment benefits for Williams under AS 23.30.041. Dr. Dunn prescribed a home gym and physical therapy for Williams on November 11. On December 19 Knik controverted the home gym as excessive due to the prescription of physical therapy and an already-provided exercise bicycle and Jacuzzi. However, Knik subsequently provided the home gym when Dr. Dunn indicated that Williams should be transitioned from formal physical therapy to a home exercise regimen.

On November 21 Williams was treated at Central Peninsula General Hospital by Dr. Robert Ledda after falling on black ice and injuring his back, buttocks, and left knee. However, a report by Dr. Ledda stated that the treatment was of the right knee. Knik received a bill for treatment of the right knee that was not accompanied by a medical record. Knik controverted the bill, as treatment of the right knee was not related to any employment-related injury.

On February 24, 1998 rehabilitation specialist Robert Sullivan determined that Williams met all the reemployment eligibility requirements in AS 23.30.041 but recommended that the reemployment benefit file be closed based on two considerations. First, Williams wrote a letter on February 22 declining reemployment benefits and requesting $10,000 in lieu of training. Second, Dr. Shirey, Williams's treating psychiatrist, stated in February 1998 that Williams was unable to be gainfully employed at that time.

3. "Iatrogenic narcotic dependency" is narcotic dependency resulting from the use of prescribed drugs.

4. Global assessment of functioning measures "a patient's psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Text revisions 2000).

In response, the Reemployment Benefits Administrator closed the reemployment file and Knik recharacterized Williams's benefits from TTD to Permanent Total Disability (PTD) benefits on March 24.

### B. Proceedings

On March 31, 1998 Williams filed a petition with the board requesting a variety of benefits. The issues were amended in a series of prehearing conferences. The board heard Williams's claims and listened to a plethora of witnesses at the hearing on November 5 and 6, 1998, in connection with Williams's compensation claims. Charles W. Coe took over as Williams's attorney for the hearing because Jones was to be a witness at the hearing on the issue of setting aside the compromise and release. The board also heard evidence on the value of services rendered by Jones on behalf of Williams. Specifically, Jones submitted an affidavit prepared by Williams's wife containing a spreadsheet of the hours Jones expended on Williams's claims. Jones also orally supplemented his affidavit during the hearing, submitted a corrected affidavit on November 4, 1998, and filed a third affidavit on November 9. Knik objected to the consideration of the affidavits filed on November 4 and November 9 since the preconference order directed Coe to serve the affidavits no later than October 28.

The board denied and dismissed many of Williams's claims including: that he was entitled to PTD benefits from August 21, 1992 through March 23, 1998; that the compensation rate should be adjusted under AS 23.30.220; that the compromise and release should be set aside; that Knik unfairly or frivolously controverted claims under AS 23.30.155(d) and (o); and that Williams was entitled to additional penalties under AS 23.30.155(e).

The board awarded Williams $6,046 for Coe's attorney's fees plus $570 in costs. Coe was awarded half of the claimed attorney's fees because Williams prevailed on relatively few issues at the hearing. The board found that one-half of the claimed fees was reasonable when taking into account the complexity of the claims, the large number of claims addressed, and the benefit to Williams in the partially successful prosecution of the claims. The board found that full costs were reasonable.

The board also awarded Williams the statutory minimum attorney's fees for Jones's services and $450 for Jones's testimony as a witness. The board did not consider the November 4, 1998 affidavit because it was submitted in violation of the preconference order requiring affidavits to be filed by October 28. The board also did not consider the November 9 affidavit. The board ruled that this affidavit was submitted after the board closed the record for the hearing. Finally, the board found that the listings in the affidavit filed on October 28 were not clear enough to make a well-supported award of fees.

Williams filed a motion for reconsideration, asking the board to reconsider the rulings on the claims that were denied and dismissed and the award of attorney's fees for the services of both Coe and Jones. Williams also argued that he was denied his right to due process because a videotape of the proceedings shows that one of the panel members was asleep during testimony and arguments. Williams does not identify which panel member he claims fell asleep during the proceeding. The board issued an Interlocutory Decision and Order finding that the parties had a full opportunity to present evidence at the hearing for the board's consideration. However, the board did retain jurisdiction over the motion for thirty days in order to review the videotape. The board then issued a Final Decision and Order on Reconsideration finding that a review of the videotape showed that all three members of the panel were actively participating in the hearing and that there was no evidence that one member was asleep.

Williams appealed the board's decision to the superior court. He challenged the board's decision regarding the issues of recharacterization of benefits to PTD, a compensation rate adjustment, unfair controversion, additional penalties, and the attorney's fees awarded for both Coe's and Jones's services. In addition, Williams also appealed the board's denial of his motion for reconsid-

eration, claiming that a panel member was sleeping at various times of the proceeding and that the board did not give due consideration to the evidence presented. The superior court affirmed the decision of the board on all issues except for the award of attorney's fees to Jones. With respect to Jones's attorney's fees, the superior court held that the board erred in not considering Jones's amendment to his affidavit and his supplemental affidavit. The superior court found that the policy consideration of making attorney's fees fully compensatory and reasonable so that injured workers would be able to find competent counsel necessitated that the board take these affidavits into account. Accordingly, it remanded the matter so that the board could review the late-filed affidavits before formulating its attorney's fee award.

Williams appeals the superior court's ruling. Knik has filed a cross-appeal claiming that the superior court improperly remanded the issue of Jones's fees back to the board for consideration of the late-filed affidavits.

## III. STANDARD OF REVIEW

■ When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review and directly scrutinize the merits of the board's decision.[5] In questions of law involving the agency's expertise, the rational basis standard will be applied and the agency's determination will be deferred to so long as it is reasonable.[6] The rational basis standard is applied where the agency's expertise is involved or where the agency has made a fundamental policy decision.[7] We will substitute our own judgment for questions of law that do not involve agency expertise "or where the agency's specialized knowledge and experience would not be particularly probative as to the meaning of the statute."[8] We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

■ Factual findings made by the board are reviewed under the substantial evidence standard.[10] Factual findings will be upheld so long as there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]

■ A compromise and release is interpreted in the same manner as any other contract.[12] We review the interpretation of a contract *de novo* when the underlying facts are undisputed.[13] However, we review a contract under the substantial evidence standard when the issue is the intent of the parties when forming the contract.[14]

■ Unless statutory interpretation is required, we review an award of attorney's fees by the board under the abuse of discretion standard.[15] The award of attorney's fees should be upheld unless it is "manifestly unreasonable."[16]

## IV. DISCUSSION

### A. The Superior Court Erred in Remanding the Issue of Jones's Attorney's Fees for Consideration of the Late-Filed Affidavits.

■ We consider first Knik's cross-appeal. We do this because it raises a thresh-

5. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

6. *Tesoro Alaska Petroleum Co.*, 746 P.2d at 903.

7. *Id.*

8. *Id.*

9. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

10. *DeYonge*, 1 P.3d at 94.

11. *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

12. *Cameron v. Beard*, 864 P.2d 538, 545 (Alaska 1993) (citing *Schmidt v. Lashley*, 627 P.2d 201, 204 n. 7 (Alaska 1981)).

13. *Oaksmith v. Brusich*, 774 P.2d 191, 195 (Alaska 1989).

14. *Id.*

15. *Bouse v. Fireman's Fund Ins. Co.*, 932 P.2d 222, 241 (Alaska 1997).

16. *Id.* (citing *Bailey v. Litwin Corp.*, 780 P.2d 1007, 1011 (Alaska 1989)).

old issue that affects our jurisdiction over the entire case. Knik claims on cross-appeal that the superior court erred in remanding the issue of Williams's attorney's fees to the board for consideration of affidavits excluded at the hearing. When a superior court acts as an intermediate appellate court, a decision reversing and remanding an agency ruling for further adjudication is not a final judgment.[17] However, we have the discretion to treat this as a petition for review pursuant to Appellate Rule 402.[18] And we have, in appropriate cases, reached the merits of a case by treating an otherwise premature appeal as a petition for review.[19] We may review a non-final judgment when postponement of review will result in unnecessary expense or delay.[20] Because we conclude below that the superior court erred in remanding this issue, we will treat this appeal as a petition for review in order to avoid unnecessary delay.

■ The board decided not to consider affidavits filed by Jones on November 4 and November 9, 1998 because they were filed late. On October 14, 1998, the board had issued a prehearing conference order specifically directing that affidavits concerning attorney's fees and costs be filed and served no later than October 28. The board held Jones to the terms of the prehearing order and did not consider the affidavits filed and served after the October 28 deadline. The board did consider Jones's affidavit filed on October 28 but found this affidavit to be largely undecipherable and, to the extent it could be deciphered, inaccurate.

The board held Jones to the prehearing order, which it had the authority to do.[21] We have held that the board has "discretion to exercise reasonable control over its proceedings to ensure the orderly administration of

justice."[22] While there is a policy in favor of making attorney's fees in workers' compensation cases fully compensatory, the policy does not relieve an attorney from following the procedural rules for obtaining compensation. Jones filed the second affidavit one day before the hearing and the third affidavit after the hearing was over. No reasons have been offered by Jones or Williams as to the reasons for the late filing. And it hardly seems fair to give the employer one day to look over six years of attorney's fees and then to allow another affidavit after the record for the hearing has closed. Jones was on notice as to the requirements for filing his affidavit and the board acted within its discretion to hold him to those requirements.

As for the affidavit filed by Jones on October 28, 1998, it contains illegible handwritten notes, it shows no total number of hours expended, and the entries are not in chronological order, among other problems. The board cannot be expected to decipher it. Although the board may not arbitrarily deny attorney's fees, the one affidavit filed in compliance with the board's order is incomprehensible.

In sum, the board did not abuse its discretion in awarding Williams the statutory minimum in attorney's fees for Jones's representation. It was entitled to reject the late-filed affidavits, and the one timely affidavit did not establish the case for more.

**B. The Superior Court Did Not Err in Affirming the Board's Decision Denying Williams's Claim for PTD Benefits from August 21, 1992 through March 23, 1998.**

■ Williams claims that he was totally and permanently disabled from the day of

---

17. *City of North Pole v. Zabek,* 934 P.2d 1292, 1295 (Alaska 1997) (citing *City and Borough of Juneau v. Thibodeau,* 595 P.2d 626, 629 (Alaska 1979)).

18. *Zabek,* 934 P.2d at 1296.

19. *See id.; see also Waldroup v. Lindman,* 28 P.3d 293, 301 (Alaska 2001) (stating that "we choose to treat it as if it were raised by a petition for review and review its merits to avoid a possible future appeal on this issue").

20. Alaska R.App. P. 402(b)(1).

21. 8 Alaska Administrative Code (AAC) 45.065 states in relevant part:

 (c) After a prehearing the board or designee will issue a summary of the actions taken at the prehearing, the amendments to the pleadings, and the agreements made by the parties or their representatives. The summary will limit the issues for hearing to those that are in dispute at the end of the prehearing. Unless modified, the summary governs the issues and the course of the hearing.

22. *Lajiness v. H.C. Price Constr. Co.,* 811 P.2d 1068, 1069 n. 2 (Alaska 1991).

the accident. Williams alleges that the board failed to apply to his claims the presumption that injuries are compensable. We disagree.

Under the Workers' Compensation Act, there is a presumption in favor of compensability.[23] We have held that the presumption includes claims for PTD benefits.[24] Williams received benefits for the entire period of August 21, 1992 through March 23, 1998 and the only question is at what point his loss of earning capacity became permanent.

The only evidence Williams provided that he was permanently disabled from the date of injury was his own testimony. However, the board found Williams not to be a credible witness and "[t]he board has the sole power to determine the credibility of a witness."[25] Also, Williams offered no concrete medical evidence that he was permanently disabled as of the date of his injury.

Williams's claim that the board failed to apply the statutory presumption to his PTD claim is incorrect. In its Final Decision and Order, the board clearly applied the presumption to Williams's claim. In fact, the board set out the case law behind the presumption in an extended discussion. The board went on to find that Williams did not establish the necessary link for the presumption to attach. Finally, the board assumed that he did establish the link and analyzed the matter as the law requires. First, the Board found that prior to Dr. Shirey's evaluation on February 10, 1998, none of Williams's doctors stated that he was permanently disabled and unable to return to work. The Board also found that Williams was released to work on April 5, 1994 by Dr. Gier-

inger and released to seek reemployment training on July 28, 1997 by Dr. Dunn. These findings are supported by the record. Finally, there is also various medical evidence in the record to show that, before March 23, 1998, the doctors were optimistic that Williams would not be permanently disabled. The board applied the presumption properly.

## C. The Superior Court Did Not Err in Affirming the Board's Decision Denying Williams's Claim for a Compensation Rate Adjustment.

Williams argues that the board erred in denying him a compensation rate adjustment. He claims that the information relied on by the board in determining his compensation rate was inaccurate. Alaska Statute 23.30.220(a) governs the calculation of a compensation rate.[26]

The board relied on Williams's W–2 statements for 1990, 1991, and 1992. Williams argues that his W–2s were an inaccurate predictor of his earning capacity. Williams claims that he worked for Patrick Abood on several jobs in which the wages were not accurately reported to the Internal Revenue Service and that he had additional sources of income. Because Williams believes that the W–2 forms do not accurately reflect his earnings while employed by Knik, Williams states that the board should have used his hourly rate times forty hours per week and then taken his additional income into account. However, there was sufficient evidence for the board to find that Williams's

---

23. AS 23.30.120 states in relevant part:
(a) In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that
(1) the claim comes within the provisions of this chapter

24. *Meek v. Unocal Corp.*, 914 P.2d 1276, 1279–80 (Alaska 1996).

25. AS 23.30.122.

26. The version of AS 23.30.220(a) in effect on the date of Williams's injury stated in relevant part:
(a) The spendable weekly wage of an injured employee at the time of an injury is the basis for computing compensation. It is the em-

ployee's gross weekly earnings minus payroll tax deductions. The gross weekly earnings shall be calculated as follows:
(1) the gross weekly earnings are computed by dividing by 100 the gross earnings of the employee in the two calendar years immediately preceding the injury;
(2) if the employee was absent from the labor market for 18 months or more of the two calendar years preceding the injury, the board shall determine the employee's gross weekly earnings for calculating compensation by considering the nature of the employee's work and work history, but compensation may not exceed the employee's gross weekly earnings at the time of the injury.

W–2 forms were an accurate predictor of his lost earning capacity.

Williams's W–2s indicate income of $5,133.00 in 1990, $19,758.75 in 1991, and $9,766.75 in 1992. The board found that the earnings reported on his W–2s were consistent with the earnings that Williams reported in his income tax returns and what he reported to his claims adjuster, George Klim. Williams provided no documentation of any additional wages. The board also found that Williams's Employment Security Division records for 1992 show that Williams collected unemployment benefits in 1992 for about six out of the eight months prior to his injury.

The board's findings are supported by substantial evidence in the record. First, Williams's tax returns report the same amounts as reported by Knik on the W–2 forms. Second, George Klim testified at the board hearing that Williams never stated that he had additional sources of income and that, if he had, his rate would have been adjusted accordingly. Williams stated in a form sent to the Department of Labor that his earnings for the two years prior to the injury were $24,892, which is exactly the sum of the income reported on his W–2 forms for 1990 and 1991 as rounded to the nearest dollar. The board's findings are also supported by Williams's Employment Security Division records for 1992 because they show that he had no source of income during that year other than his job with Knik. The only evidence offered to support additional earnings is testimony by Williams, and, as stated above, the board found Williams not to be a credible witness. The board therefore had substantial evidence to find that Williams's W–2 forms were an accurate predictor of his earning capacity.

■ Williams additionally argues that application of AS 23.30.220(a) led to an incorrect compensation rate, relying on *Gilmore v.* *Alaska Workers' Compensation Board.*[27] In *Gilmore,* we found that the version of AS 23.30.220 in effect at the time of Williams's injury was unconstitutional under the equal protection clause as applied to that case.[28] Former AS 23.30.220(a)(1) required that the gross weekly earnings of an employee present in the labor market for six months or more were to be calculated according to a mechanical formula that took gross wages over a two-year period and divided this sum by 100.[29] This formula was applied regardless of how many weeks the employee actually worked during the period, and Gilmore had actually worked only thirty-nine weeks in the preceding 100.[30] We held that this mechanical application violated Gilmore's equal protection rights because, as applied to him, the benefit level bore no more than a coincidental relationship to the goal of compensating injured employees for their actual loss.[31] In *Thompson v. United Parcel Service,*[32] we explained our ruling in *Gilmore.* Thompson was injured two weeks after involuntarily changing from full-time work to part-time work. Under AS 23.30.220(a) her gross weekly earnings were based on her full-time pay because Thompson filed an application for adjustment to increase her compensation rate by having her earnings from her previous full-time job included and her application was granted. Her employer claimed that this change in her status required that the board deviate from the statutory formula used to determine the rate of pay to which an injured party is entitled.[33] We rejected that argument and held that the statutory formula in AS 23.30.220(a) must be used to calculate the employee's gross weekly earnings.[34] We made clear that departure from the statutory formula "must be based on substantial evidence supporting the conclusion that past wage levels will lead to an irrational workers' compensation award."[35] Specifically, there must be substantial evi-

---

27. 882 P.2d 922 (Alaska 1994).

28. *Id.* at 929.

29. *Id.* at 924.

30. *Id.*

31. *Id.* at 928.

32. 975 P.2d 684 (Alaska 1999).

33. *Id.* at 685–87.

34. *Id.* at 689.

35. *Id.*

dence that past wages are an inaccurate predictor of loss due to injury.[36] We stated that the inquiry is not to determine whether the statutory application led to a "fair" result, but whether the formula accurately predicted what the employee would have earned had he or she not been injured.[37]

Since Williams is the party asking for a deviation from AS 23.30.210(a), he must present substantial evidence that the use of past wages will lead to an irrational workers' compensation award. Williams cites testimony in support of his claim that he made more than his W–2 forms reflect. However, the testimony cited does not constitute substantial evidence that use of his past wages will lead to an irrational workers' compensation award. Williams cites Patrick Abood's testimony that checks were written out to Williams's girlfriend instead of Williams, but Abood testified that the income reflected in the check was still attributed to Williams in his W–2 forms. Williams claims that he did work around Abood's house that he was paid for, but Abood testified that Williams did the work as a favor to Abood, and Abood never paid Williams for this work. Williams also states that his income from his mobile home business should have been taken into account. However, the supplemental income and loss form filed with the IRS by Williams in 1991 shows that the mobile home business was operating at a loss.

Next, Williams cites the testimony of a friend who also worked for Knik, Daniel Neisinger, to support Williams's claim that he worked more than what was reflected on his W–2 forms. Neisinger testified that he believed that Williams worked more than Neisinger did and that Neisinger's personal income in 1990 was $19,633. Neisinger also testified that Knik made errors in the W–2 form sent to the IRS for Neisinger's earnings in 1990 and 1991 and that Williams did some work around Patrick Abood's house. But the board explicitly found that it could not "accord any substantial weight to Mr. Neisinger's testimony," pointing to documen-

tary evidence that refuted it. Moreover, Neisinger's testimony appears to be mere speculation about what Williams earned while working for Knik; it is not based on first-hand knowledge. The board's decision to discount Neisinger's testimony was not clearly erroneous. The only other evidence offered by Williams is his own testimony.

Williams also claims that the board erred in failing to apply the presumption in favor of compensability [38] to his claim for a compensation rate adjustment. Applying the presumption of compensability would be inconsistent with our holding in *Gilmore*. As discussed above, the board must use the formula in AS 23.30.220(a) to calculate an employee's gross weekly earnings unless there is substantial evidence supporting the conclusion that past wage levels will lead to an irrational workers' compensation award.[39] Here, Williams had the burden of proving that the statute was an inaccurate predictor of his future earnings loss due to injury. Williams did not satisfy that burden. Applying the presumption to a claim for a compensation rate adjustment would be in conflict with the rule requiring substantial evidence to be presented before the board can deviate from the statutory formula. Thus, Williams is not entitled to a compensation rate adjustment under any theory argued.

**D. The Superior Court Did Not Err in Affirming the Board's Decision Denying Williams's Request To Set Aside His Partial Compromise and Release.**

Williams claims that the board erred in failing to set aside the compromise and release that was entered into on July 2, 1997. A compromise and release approved by the board "is enforceable the same as an order or award of the board and discharges the liability of the employer for the compensation." [40] Williams gives two reasons why the compromise and release should be set aside. First, Williams claims that he was mentally incompetent when he signed the release. Second, Williams claims that the compromise

36. *Id.*

37. *Id.*

38. AS 23.30.120(a)(1).

39. *Thompson,* 975 P.2d at 689.

40. AS 23.30.012.

and release does not cover penalties for late payment on medical bills. We discuss these two claims separately.

### 1. The board did not err in finding Williams mentally competent.

■ Williams argues that he was so medicated and psychologically unstable at the time he signed the compromise and release that he could not be expected to overcome the pressure put on him by Knik to sign the agreement. The board found, by a preponderance of the available evidence, that Williams was mentally competent at the time he signed the agreement. The board's findings were supported by substantial evidence. Dr. Chandler testified that people who are on oral narcotics for many months, as Williams was, are usually functional and able to make decisions. Dr. Shirey, Williams's treating psychiatrist, testified that Williams was able to handle his own affairs upon his release from the hospital on June 8, 1997. Also supporting the board's findings is the fact that Williams was represented by counsel when he signed the agreement. Williams offers no medical testimony to support the claim that he was mentally incompetent. Therefore, the board did not err in finding Williams mentally competent when he signed the compromise and release.

■ Williams also claims that Knik procured the compromise and release through duress. Williams generally claims that he did not understand the extent to which he was releasing his claims. In *Olsen Logging Co. v. Lawson,*[41] we held that the board cannot set aside a compromise and release on the basis of unilateral and mutual mistake grounds.[42] We also stated that a compromise and release, once approved by the board, is very difficult to set aside.[43] Ac-

cordingly, that Williams did not understand the extent to which he was releasing his claims—even if true—is not a basis for setting aside the compromise and release. We have held that the board can set aside a compromise and release for fraud.[44] However, Williams offers no specific evidence that Knik acted intentionally.[45] The board found that Knik made good faith controversions and had sufficient evidence for a difference of opinion with Williams. Therefore, there was no evidence of fraud or duress and, thus, no reason to set aside the compromise and release.

### 2. The board did not err in finding that the compromise and release covered penalties for late payment of medical bills.

■ Williams claims that the board erred in finding that the compromise and release released Knik from all pre-July 1, 1997 penalties. Williams claims that the parties did not intend to release Knik from all penalties when the agreement was signed, only those penalties relating to the specific issues addressed by the agreement. A compromise and release "is interpreted in the same manner as any other contract."[46] Because this issue presents a factual question—what the parties intended when they entered into the compromise and release—the substantial evidence standard is used in reviewing the board's findings.

■ Broad language in settlement agreements implies that all claims are settled; the parties must specifically state claims that are not settled.[47] Section 8 of the compromise and release contains language that releases "the employer and the carrier from any and all liability arising out of or in any way connected with the issues listed above." The

**41.** 856 P.2d 1155 (Alaska 1993).

**42.** *Id.* at 1159 (holding that AS 23.30.012 is an "expression of legislative intent that approved agreements may not be modified because of mistakes of fact.").

**43.** *Id.* at 1158.

**44.** *Blanas v. Brower Co.,* 938 P.2d 1056, 1060–62 (Alaska 1997).

**45.** *Barber v. Nat'l Bank of Alaska,* 815 P.2d 857, 862 (Alaska 1991) (listing requisite elements for fraud cause of action).

**46.** *Cameron v. Beard,* 864 P.2d 538, 545 (Alaska 1993) (citing *Schmidt v. Lashley,* 627 P.2d 201, 204 n. 7 (Alaska 1981)).

**47.** *See Martech Constr. Co., Inc. v. Ogden Envtl. Servs., Inc.,* 852 P.2d 1146, 1152 (Alaska 1993) (stating that "the agreement indicates a complete washing of the hands between the parties using as soap blatantly broad language to cover all

use of such broad language contemplates the settling of all disputes the parties may have. The issue of penalties and interest was contested by the parties at the time the parties entered into the compromise and release. It is incongruous for the parties to use such broad language and settle for a total sum of $20,500 while intending for certain issues to remain contested. Also, the compromise and release listed penalties and interest as separate issues, which could reasonably be read to mean that the parties were settling their disputes over all penalties and interest prior to July 2, 1997. Therefore, there was subtantial evidence to support the board's finding that the compromise and release covered penalties on untimely paid medical benefits. Because substantial evidence supported the board, we uphold its decision.

### E. The Superior Court Did Not Err in Affirming the Board's Decision Denying Williams's Claim for Additional Penalties under AS 23.30.155(e).

Williams claims that the carrier delayed in paying medical bills to the point of delinquency, and is therefore liable for penalties. He notes that many medical bills were controverted because of a lack of documentation or failure to supply necessary information by the medical providers, and asserts that this delinquency caused him severe emotional stress. He argues that if he had been made aware of the documentation problems within a reasonable time he would have been able to aid in their resolution and thereby avoid the stress he claims he suffered.[48]

 Medical bills for an employee's treatment must be paid by the employer within fourteen days after the date on which the employer received the bill and a completed report.[49] Alaska Statute 23.30.155 provides for a late penalty on all compensation not paid within seven days after it has become due unless the employer has filed a notice of controversion and notified the employee of the controversion.[50] We have held that medical benefits are considered "compensation" for the purpose of AS 23.30.155.[51] Therefore, the employer is liable for penalties on any medical bills not paid within twenty-one

possible causes of action" and that "although the [claim] was not specifically discharged, neither was it specifically reserved as an independent claim.").

**48.** The briefs do not make clear whether the controverted penalties and interest are before or after July 2, 1997. Williams is not entitled to any penalties or interest for late-paid medical benefits prior to July 2, 1997, regardless of the theory argued, because these claims were released under the compromise and release:

**49.** The version of 8 AAC 45.082(d) in effect during the relevant time period states in relevant part:

(d) Medical bills for an employee's treatment are due and payable within 14 days after the date the employer received the medical provider's bill and a completed report on form 07–6102....

(1) a medical bill or if the medical bill is not paid in full as billed, the employer shall tell the employee and medical provider in writing the reasons for not paying all or a part of the bill or the reason for delay in payment within 14 days after receipt of the bill and completed report on form 07–6102.

**50.** AS 23.30.155 states in relevant part:

(b) The first installment of compensation becomes due on the 14th day after the employer has knowledge of the injury or death. On this date all compensation then due shall be paid. Subsequent compensation shall be paid in installments, every 14 days, except where the board determines that payment in installments should be made monthly or at some other period.

. . . .

(d) ... If the employer controverts the right to compensation after payments have begun, the employer shall file with the board and send to the employee a notice of controversion within seven days after an installment of compensation payable without an award is due....

(e) If any installment of compensation payable without an award is not paid within seven days after it becomes due, as provided in (b) of this section, there shall be added to the unpaid installment an amount equal to 25 percent of it. This additional amount shall be paid at the same time as, and in addition to, the installment, unless notice is filed under (d) of this section or unless the nonpayment is excused by the board after a showing by the employer that owing to conditions over which the employer had no control the installment could not be paid within the period prescribed for the payment.

**51.** *Childs v. Copper Valley Elec. Ass'n,* 860 P.2d 1184, 1192 (Alaska 1993).

days after receipt of the bill and a completed report.

Williams contends that under 8 AAC 45.082(d)(1) an employer must notify an employee fourteen days after the bill is received if this bill will not be paid, even if nonpayment is because a completed report has not been received. Williams argues that an employer should also be liable for penalties when it fails to give notice to the employee that a report was not received from the medical provider. The board found this reading of 8 AAC 45.082(d)(1), which it termed "novel," to be wrong because it read subsection (d)(1) in isolation and without reference to the rest of subsection (d). The board found that payment is not due until the completed medical record is received and that no notice of delay or refusal to pay is due until fourteen days after the bill and the completed medical report are received by the employer.

Since this regulation involves the expertise of the board in determining when compensation benefits are due, the board's findings are reviewed under a rational basis standard.[52] We have held that a rational basis standard is applied when the agency is " 'making law by creating standards to be used in evaluating the case before it and future cases.' "[53] We uphold the board's findings because its interpretation is a reasonable one. First, the fourteen-day time period establishing a payment due date under 8 AAC 45.082(d) does not start to run until a completed report is received.[54] This implies that the employer does not have to take action on the bill until a completed report is received. Second, penalties under AS 23.30.155(e) are imposed solely for failure to make payment within seven days after payment is due; there is no mention of a penalty for failure to notify.[55] Therefore, the board did not err in finding that Williams was not entitled to penalties under AS 23.30.155(e).

**F. The Superior Court Did Not Err in Affirming the Board's Decision Denying Williams's Claims that Knik Unfairly or Frivolously Controverted Benefits.**

An employee is entitled to penalties on compensation due if compensation is not properly controverted by the employer.[56] Williams claims that the board erred in finding that Knik properly controverted his claims. We have held that an employer must have sufficient evidence in order to make a good faith controversion.[57] Specifically, there must be "reliance by the insurer on responsible medical opinion or conflicting medical testimony."[58] The board had substantial evidence to find that Knik did not unfairly or frivolously controvert benefits after July 2, 1997.[59]

First, the board found that Knik had specific evidence to controvert Williams's treatment at Central Peninsula Hospital on January 28, 1998. Christine Preston, Knik's claim representative, testified that the only treatment notes she received on the hospital bill indicated that treatment was for the right knee due to a fall. This evidence is confirmed by an evaluation report. Since Williams's work-related injury was to his left knee, there was a sufficient medical basis to controvert. Therefore, the board did not err in finding that Knik did not act in bad faith.

Second, the board found that Knik had specific evidence to controvert the home gym prescribed for Williams on November 25, 1997. The board found that there was reasonable medical evidence that the same doctor

52. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (quoting *Earth Resources v. State Dep't of Revenue*, 665 P.2d 960, 964 (Alaska 1983)).

53. *Id.*

54. 8 AAC 45.082(d).

55. AS 23.30.155(e).

56. AS 23.30.155.

57. *Harp v. ARCO Alaska, Inc.*, 831 P.2d 352, 358 (Alaska 1992).

58. *Id.* (quoting *Stafford v. Westchester Fire Ins. Co. of New York*, 526 P.2d 37, 42 (Alaska 1974), *overruled on other grounds, Cooper v. Argonaut Ins. Companies*, 556 P.2d 525 (Alaska 1976)).

59. Controversions occurring prior to July 2, 1997 are covered by the compromise and release and, therefore, may not be raised in this appeal.

was simultaneously, inconsistently, prescribing formal physical therapy in a clinic. This conclusion is supported by the prescriptions for both the home gym and physical therapy. This finding is also supported by the testimony of Carol Jacobsen, a rehabilitation specialist working at the request of the insurance company. Thus, there was substantial evidence that Knik did not unfairly or frivolously controvert this claim.

### G. The Superior Court Did Not Err in Affirming the Board's Decision Awarding Only One–Half of Coe's Attorney's Fees to Williams.

Williams claims that the board erred in awarding him one-half of Coe's actual fees. The board felt that one-half of Coe's actual fees was reasonable under AS 23.30.145(b) and 8 AAC 45.180.[60] The board found that Williams's case was "complicated, extremely confusing, and tenaciously litigated." The board also found that Coe devoted an exceptional number of hours to Williams's case in order to attend the hearing and replace Jones, who testified at the hearing. However, the board found that Williams prevailed on relatively few issues. Taking into account the large number of issues addressed, the complexity of these issues, and the benefit to Williams in partially successful prosecution of his claims, the board found that one-half of Coe's actual fees was reasonable.

We have held that awards of attorney's fees under AS 23.30.145 "should be *fully* compensatory and reasonable, in order that

injured workers have competent counsel available to them."[61] However, this does not mean that an attorney representing an injured employee in front of the board automatically gets full, actual fees. We held in *Bouse v. Fireman's Fund Insurance Co.* that an employee is entitled to "full reasonable attorney's fees for services performed with respect to issues on which the worker prevails."[62] In that case, the board found that Bouse was not entitled to 100 percent of his attorney's fees because he did not prevail on all issues and instead awarded him half of his attorney's fees.[63] We upheld the board's findings because the claims on which Bouse did not prevail were worth as much as the claims on which he prevailed.[64]

Here, the board weighed the nature, length, and complexity of Coe's services with the number of issues on which Williams actually prevailed as required under the law.[65] Williams prevailed on his claims for medical benefits for treatment at Central Peninsula Hospital on November 21, 1997 with related costs and reimbursement for additional medical transportation costs. Williams also obtained interest on these claims. However, Williams did not prevail on his claims for PTD benefits, a compensation rate adjustment, the setting aside of the compromise and release, additional penalties, and unfair or frivolous controversions. Also, the board found that it did not have jurisdiction to award civil penalties or criminal sanctions against Knik. The board did not abuse its discretion when awarding Williams one-half

---

60. AS 23.30.145(b) states:

(b) If an employer fails to file timely notice of controversy or fails to pay compensation or medical and related benefits within 15 days after it becomes due or otherwise resists the payment of compensation or medical and related benefits and if the claimant has employed an attorney in the successful prosecution of the claim, the board shall make an award to reimburse the claimant for the costs in the proceedings, including a reasonable attorney fee. The award is in addition to the compensation or medical and related benefits ordered.
8 AAC 45.180 states in relevant part:
(d) The board will award a fee under AS 23.30.145(b) only to an attorney licensed to practice law under the laws of this or another state.

. . . .

(2) In awarding a reasonable fee under AS 23.30.145(b) the board will award a fee rea-

sonably commensurate with the actual work performed and will consider the attorney's affidavit filed under (1) of this subsection, the nature, length, and complexity of the services performed, the benefits resulting to the compensation beneficiaries from the services, and the amount of benefits involved.

61. *Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1190 (Alaska 1993) (emphasis in original) (citing *Cortay v. Silver Bay Logging*, 787 P.2d 103, 108 (Alaska 1990)).

62. *Bouse v. Fireman's Fund Ins. Co.*, 932 P.2d 222, 241 (Alaska 1997).

63. *See id.* at 241.

64. *See id.* at 241–42.

65. AS 23.30.145(b) and 8 AAC 45.180(d)(2).

of Coe's actual attorney's fees. Therefore, we uphold the award of one-half of Coe's attorney's fees.

### H. The Superior Court Did Not Err in Finding that a Panel Member's Alleged Misconduct Did Not Violate Williams's Due Process Rights.

Williams claims that his due process rights were violated when his case was decided by a panel that contained a member he claims fell asleep during the hearing. Williams also claims that sleeping during the hearing by a panel member violated his due process rights. Williams offers the videotape of the hearing as proof that a panel member slept during the hearing. Williams never specifically named nor otherwise identified any particular panel member as the one that slept. Our review of the videotape failed to reveal any evidence of a sleeping panel member. Without more evidence or, at the very least, disclosure of the identity of the alleged sleeping board member, Williams has no claim for relief. Moreover, failure to make the appropriate objection during the hearing waives the right to appeal procedural errors.[66] Therefore, by not producing sufficient evidence and by failing to raise the issue of the allegedly sleeping board member at the hearing, Williams has waived the issue.

### I. The Superior Court Did Not Err in Affirming the Board's Decision To Deny Williams's Petition for Reconsideration.

Williams claims that the board did not give due consideration to any of the evidence presented by Williams in his petition for reconsideration. Under 8 AAC 45.150, the board has discretion to decide whether it will examine previously submitted evidence but must give due consideration to any petition for reconsideration.[67] The board found that the "record was fully developed" and that "the case was fully and capably argued by both parties." The board exercised its discretionary authority to grant a limited review in order to view the videotape of the alleged sleeping panel member. After each panel member independently viewed the videotape the board found that "all three panel members were actively following the testimony, discussion and argument of the hearing." The board gave due consideration to Williams's petition for reconsideration and the denial of the petition was not an abuse of discretion.

## V. CONCLUSION

The decision of the superior court was not a final judgment because the superior court remanded the issue of Jones's fees to the board for further proceedings. However, we treat this appeal as a petition for review under Appellate Rule 402 and resolve all issues presented in the case. We AFFIRM the superior court in all respects save one: We REVERSE its ruling that the board abused its discretion by excluding the two affidavits filed late by Jones and hold that the board did not err in refusing to consider late affidavits under the pre-hearing order. On all of the other issues raised in this appeal, we AFFIRM the decision of the superior court.

---

66. *See Williams v. Util. Equip., Inc.*, 837 P.2d 1112, 1116–1117 (Alaska 1992) (stating that "Williams waived his objections, despite the protective order, when he did not make specific objections as the testimony was presented"); *Far N. Sanitation, Inc. v. Alaska Pub. Utils. Comm'n*, 825 P.2d 867, 873 n. 8 (Alaska 1992) (stating that the "conclusion that Far North's failure to object or raise the point before the Alaska Public Utilities Commission constitutes waiver, because any other result would inevitably create an incentive for dilatory failure to assert error"); *Gilbert v. State*, 598 P.2d 87, 92 (Alaska 1979) (stating that "[w]here the error is not obvious or immediately apparent we should abstain from a full-scale examination of it, for the basic rule is that failure to object to offered evidence waives the objec-

tion"); *McGee v. State*, 614 P.2d 800, 803–04 & n. 6 (Alaska 1980) (holding that failure to make timely objection at trial to introduction of evidence concerning a lineup, waived defendant's argument that photographic identification procedure was so impermissibly suggestive and unreliable as to violate due process of law).

67. 8 AAC 45.150 states in relevant part:

(f) In reviewing a petition for a rehearing or modification the board will give due consideration to any argument and evidence presented in the petition. The board, in its discretion, will decide whether to examine previously submitted evidence.