NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NOELLE McCULLOUGH, | ) | |
| | ) | Supreme Court No. S-14302 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| | ) | Appeals Commission Nos. 08-014, |
| v. | ) | 13-025 |
| | ) | |
| JOB READY, INC., and NORTH | ) | MEMORANDUM OPINION |
| AMERICAN SPECIALTY | ) | AND JUDGMENT* |
| INSURANCE COMPANY, | ) | |
| | ) | No. 1604 – December 21, 2016 |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Noelle McCullough, pro se, Anchorage, Appellant. Randall J. Weddle and Troy D. Bittner, Holmes Weddle & Barcott, P.C., Anchorage, for Appellees.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

I.     **INTRODUCTION**

A child's caregiver alleges she was injured when the child's father slapped her on the back. The father admitted physical contact but said he merely gave the worker a pat on the back to indicate approval of her job performance. The Alaska Workers' Compensation Board twice decided that the caregiver's claim for benefits was not

_____

\*      Entered under Alaska Appellate Rule 214.

compensable, and the Alaska Workers' Compensation Appeals Commission affirmed the Board's decisions. The caregiver appeals, arguing that many of the Board's findings were improperly based on evidence she believes to be false. She also alleges that the Board's hearing chairs were biased. We conclude that substantial evidence supported the Board's decisions and that there is no record support for the caregiver's claims of bias. We therefore affirm the Commission's decisions that affirmed the Board's decisions.

## II. FACTS AND PROCEEDINGS

### A. The Underlying Incident

Noelle McCullough has a degree in education; she moved to Alaska with her husband in 1995 and has lived in several communities doing different types of work. After moving to the Kenai area, McCullough worked for a service agency, Job Ready. At the time of her injury, McCullough was employed as an activity therapist for a child with a disability, working in the child's home at times. The child's parents and older brother, who was 12 at the time of the incident underlying this case, lived in the home as well.

On April 8, 2002, McCullough was sitting on a chair in the family's home watching the child, when the child's father came up from behind, hit McCullough on the back, and said, "I love a pushy broad."[1] According to the father the comment was intended as a compliment: he had been in the kitchen discussing the child's care with the child's mother and a family friend; he was impressed with McCullough's tenacity and hoped she would assist the family in getting additional services from the school district.

---

[1] There was a slight difference in testimony about the exact wording of the statement — McCullough recalled him saying, "[Y]ou're a pushy broad" — but both agreed he used the term "pushy broad."

The father later testified that, after he slapped her on the back, McCullough looked at him and said, "We do what we can." He sat on the couch and talked to McCullough for "a few minutes" afterwards, he then got up and left the room. He thought McCullough looked normal while he remained in the room, and he reported that she showed no signs of distress at all. The father described the contact as minimal: "an at-a-boy" gesture or "a friendly clasp on the shoulder." McCullough, in contrast, said he hit her so hard she was pushed "down in [her] chair," which she clarified as meaning that she was pushed forward into a position where she was bent over with her torso in her lap.[2]

McCullough testified she did not know whether she was hit with a fist or an open hand, but she thought it might have been an open hand; she did not cry out. McCullough said she was "in shock," "confused," and "[s]cared." Only McCullough, the father, and the child were in the room when the incident happened; the child is non-verbal and thus unable to describe her observations. The mother testified she did not hear anything amiss, but qualified this by explaining she was talking to someone else and would not have heard anything "unless somebody screamed, yelled, [or] dropped something, or there was some loud sudden noise." Both parents saw McCullough sorting arts and crafts supplies in the living room after the incident.

According to the mother, when she observed McCullough later that day, McCullough did not appear to be in any pain. McCullough took the child swimming at a local high school at some point after the incident. The mother saw McCullough get into the car to go to the pool, carrying a big bag that was "like a newspaper delivery boy's bag . . . [that] was always full of all her ac[co]utrement[s]."

---

[2] A medical record from 2002 indicated McCullough was six feet, one inch in height and weighed about 200 pounds.

McCullough testified she felt pain while driving to the pool, and when she arrived there she talked with Sabrina Johnson, the swim coach with Special Olympics. Johnson noted a difference in McCullough's usual demeanor, describing her as "frustrated," "disappointed," or "unhealthy" that day; Johnson also said McCullough had difficulty removing her shirt to change into her swimsuit. Johnson asked McCullough if she was okay, and McCullough told her "no" because "something disturbing [had] just happened." McCullough told Johnson that the father had hit her on the back; Johnson observed a "pinkish-red mark" with "three inches of red underneath that." Johnson described McCullough as bewildered about why the father would have hit her with so much force.

When the mother came to pick the child up from swimming, McCullough asked to meet with the parents in their home that evening. The mother testified she was upset about the proposed meeting because it was late, she was concerned the meeting would interfere with the children's bedtime, and McCullough refused to tell her why she wanted to meet with them. She also thought the meeting was inappropriate because Job Ready was McCullough's employer, not the family. She nonetheless agreed to the meeting, hurrying home and calling the father on her way there to see if he had any idea why McCullough wanted to meet with them; he did not.

At the meeting McCullough confronted the parents about the incident. The father apologized and explained to McCullough that the "pushy broad" comment was intended to be a compliment, not an insult. According to his later testimony, McCullough said she was not one to carry a grudge. McCullough agreed that the father apologized to her, but she said the mother also admonished him, telling him he could not hit McCullough. The parents agreed McCullough could have the next day off, and she never returned to work for them.

McCullough or her husband contacted the Alaska State Troopers about a week after the incident to report an assault. Trooper James Johnson interviewed McCullough and the parents in June 2002; he said that when he interviewed McCullough, her right arm was in some type of sling, but later when he was off-duty he observed her unloading groceries from her car without any restrictions in her movements. No charges were filed related to the incident.

## B. Medical Treatment

McCullough saw Lori Landstrom, a physician's assistant, two days after the incident; this was McCullough's first contact with a healthcare provider following the slap. Landstrom recorded that McCullough had an essentially normal shoulder examination and instructed McCullough to take ibuprofen and to return if her pain increased. Landstrom observed "[n]o obvious deformity, ecchymosis, or swelling of the shoulder/scapula area bilaterally."[3] McCullough returned two days later reporting increased pain. She continued to experience pain and in the ensuing months saw several healthcare providers who conducted multiple tests and prescribed several medications. A shoulder x-ray was normal; an x-ray of her cervical spine showed "mild to moderate reversal of the normal lordotic curve" but was otherwise normal. An x-ray of her thoracic spine showed "mild to moderate S-shape scoliosis" but was otherwise unremarkable.[4]

Landstrom referred McCullough to a neurologist, who doubted she had a nerve problem. McCullough also saw Dr. Byron McCord, an orthopedist; he ordered an

---

[3]    Ecchymosis is defined as "[p]assage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin." *Ecchymosis*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005).

[4]    The definition of scoliosis is the "[a]bnormal lateral curvature of the spine." *Scoliosis, id.* At least two doctors indicated McCullough's scoliosis was a preexisting condition. The Board's decisions do not reflect any dispute about this conclusion.

MRI of the chest to rule out a rhomboid tear. The MRI report indicated "no identifiable signal abnormality in the region of the rhomboid muscle on either side" and showed no other abnormalities. Dr. McCord wrote that his own review of the right-shoulder MRI suggested some asymmetry, which he thought might indicate "more fluid." His later records do not mention this observation again; they give no indication that the observation had any impact on his diagnosis or treatment of McCullough. McCullough went to physical therapy in the Kenai area from May to July 2002, apparently with little improvement; in July Dr. McCord noted she was showing no progress in spite of physical therapy.

Job Ready arranged for McCullough to see a physician, Dr. Scot Fechtel, in late July 2002; he diagnosed chronic pain syndrome and recommended an MRI of the thoracic spine to rule out several disorders. The MRI of McCullough's thoracic spine showed minimal scoliosis, which had been observed on earlier x-rays, but was otherwise normal.

McCullough restarted physical therapy in September 2002 after Landstrom again saw her; according to the medical records, the physical therapy was ordered "in regard to the scoliosis." McCullough saw the same physical therapist in July and September 2002; in the chart notes from September 23, 26, and 30, the therapist observed "visible edema [at right] scapula," "obvious edema," and "edema," but no edema is documented in the July chart notes. A different therapist saw McCullough on September 27, and no edema is mentioned in that day's chart note. When McCullough was evaluated for physical therapy in September, the therapist wrote that there were "[n]o trigger points or point tenderness found upon palpation of the mid back and scapular region."[5]

---

[5]     A trigger point is "a specific [point] or area where stimulation by touch, pain, or pressure induces a painful response." *Trigger point*, STEDMAN'S MEDICAL (continued...)

McCullough and her husband moved to Anchorage in the fall of 2002. She saw Dr. J. Michael James, a specialist in physical medicine and rehabilitation; he diagnosed possible facet syndrome, "possible root irritation of T-8 or T-9 on the right," and chronic pain syndrome. He wrote that McCullough was "self-limited in her functional limitation" and saw "no reason why she cannot return to work as an aide." He referred her to more physical therapy. Dr. James also tried medial branch blocks and medication. In December 2002 Dr. Fechtel, the employer's doctor, said McCullough was medically stable and rated her as having a five percent whole person impairment.

Also in December 2002 Dr. James and his nurse practitioner encouraged McCullough to return to work; their chart note said she "continue[d] not to work at her decision." In August 2003 Dr. James refused McCullough's request for an AnchorRIDES pass, telling her "she was not disabled to the degree required to participate in this program." Other care providers in Dr. James's office continued to treat McCullough with a nerve stimulator and acupuncture.

McCullough began to see Dr. Johnna Kohl in October 2003 and subsequently transferred her care there. Dr. Kohl noted McCullough's anxiety problems and referred her to a psychology specialist. Dr. Kohl prescribed physical therapy, and McCullough again attended physical therapy for several months. In January 2004 Dr. Fechtel gave the opinion that McCullough should be weaned from physical therapy and medications with the goal of "re-engaging her in her occupation." Dr. Fechtel wrote that McCullough needed "to attempt to regain her life" and noted that "[t]here has never been *any* objective evidence of injury." (Emphasis in original.)

---

**5**    (...continued)
DICTIONARY (28th ed. 2006).

Dr. Kohl prescribed medication to McCullough for anxiety and later referred her to Dr. Joella Beard for a second opinion "on rehab medicine." Dr. Beard deferred seeing McCullough because of a scheduled employer's independent medical evaluation (EIME) panel; Dr. Beard wanted to see if the EIME shed any light on continuing treatment. Dr. Beard later evaluated McCullough, agreed to a large extent with the EIME panel report, and made a few suggestions for follow-up care. In the end Dr. Beard did not think continuing physical therapy was needed; her only other suggestion was a referral to a rheumatologist to rule out some conditions.

The 2004 EIME, arranged by Job Ready, was with a panel of three doctors in Oregon: Stephen Fuller, an orthopedist; S. David Glass, a psychiatrist; and Lynne Bell, a neurologist. Drs. Fuller and Bell conducted physical examinations in their respective specialties. They found nothing new, noting the mild scoliosis documented in earlier imaging studies; otherwise, they concluded that McCullough displayed "pain behavior" and had "no objective pathology upon which to base a valid diagnosis." They thought her scoliosis was "insufficient to cause musculoskeletal symptoms" and noted that no bruising had been observed when she was first examined by a healthcare provider. In their opinion McCullough was medically stable as of April 22, 2002; the work injury was not a substantial factor in causing her physical condition; she needed no further medical care for her musculoskeletal complaints; and she did not sustain a permanent impairment as a result of the injury. They did not think she had any physical limitations on her ability to work.

Dr. Glass "participated in the history and physical examination with Dr. Fuller and Dr. Bell," then interviewed McCullough for about an hour and a half. He planned to administer the MMPI-2 in his office, but McCullough was too tired, so he permitted her to take the test materials home to complete. According to Dr. Glass's report, the MMPI-2 results were "compromised" because McCullough did not answer

108 "items," but "[e]ven with not answering so many items, the scale denoting hysterical psychodynamics . . . is markedly elevated, suggesting somatoform disorders and histrionic behavior patterns."

Dr. Glass diagnosed McCullough with "Pain Disorder, Associated With Psychological Factors" on Axis I; he did not make an Axis II diagnosis but wrote that "personality psychodynamics are significant in the etiology of somatoform disorders . . . and with more data, a personality disorder diagnosis is likely."[6] The other axes were either deferred or unremarkable. Dr. Glass gave the opinion that the work-related incident "did not aggravate, accelerate, or combine with any underlying psychological condition to produce Ms. McCullough's current condition"; he thought her psychiatric condition "relate[d] to psychosocial circumstances/issues and pre-existing personality factors." He also gave the opinion that (1) the work-related incident was not a substantial factor in causing her psychiatric condition; (2) she did not have "a psychiatric disability/impairment" from the work-related incident; (3) she had reached medical stability "for any psychiatric condition directly related to" the work-related incident; (4) she had no permanent partial impairment; (5) she was in need of no further psychiatric care because of the work-related incident; and (6) she had no psychiatric work restrictions.

---

[6] The DSM-IV-TR used five axes in psychiatric assessments. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION, TEXT REVISION (DSM-IV-TR) 27 (4th ed. 2000). Axis I was for clinical disorders, that is "for reporting all the various disorders or conditions in the Classification except for the Personality Disorders and Mental Retardation (which [were] reported on Axis II)." *Id.* The DSM-5 does not use a multiaxial assessment. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FIFTH EDITION (DSM-5) 16 (5th ed. 2013).

Most of McCullough's treating physicians agreed with the diagnoses made by the EIME physicians; however, Dr. Kohl disagreed with the conclusions about causation. In her opinion, the work-related incident was a substantial factor in causing McCullough's disabilities. Dr. Kohl said that pain cannot be measured objectively, that she did not think McCullough could work or was faking her pain, and that the work-related incident "was a psychologically damaging injury in the sense that everyone blew her off."

Dr. Kohl referred McCullough to psychiatric care; McCullough initially saw Dr. Thomas Ihde-Scholl in 2004. Dr. Ihde-Scholl diagnosed McCullough with "[m]ajor depressive disorder, recurrent, severe" as well as "[p]ain disorder with psychological factors" on Axis I; he deferred her Axis II diagnosis. Dr. Ihde-Scholl considered a post-traumatic stress disorder (PTSD) diagnosis but decided McCullough did not meet the diagnostic criteria because she "denied significant flashbacks, nightmares, or avoidance." McCullough took psychotropic drugs as prescribed by her doctors. After Dr. Ihde-Scholl moved away, Dr. Eileen Ha took over McCullough's psychiatric treatment. McCullough also went to counseling.

In May 2005 Dr. Kohl referred McCullough to a pain specialist, Dr. Gregory Polston. At the time of the referral McCullough was participating in a pain group as part of her counseling and was attending individual therapy at times. Dr. Polston outlined a treatment plan that included biofeedback, trigger point injections, and a possible Botox injection; he also prescribed more physical therapy. McCullough saw Robert Trombley, a psychologist, for biofeedback training shortly after seeing Dr. Polston. McCullough reported some decrease in pain with the trigger point injections.

After McCullough reported continuing scapular pain, Dr. Polston decided to try Botox injections. McCullough did not get any pain relief from the Botox injections, so Dr. Polston moved on to a thoracic epidural steroid injection. Dr. Polston changed his

diagnosis from myofascial pain to thoracic diskogenic pain after the Botox failed to provide McCullough any pain relief, but changed it back to myofascial pain after the steroid injection failed to provide any relief either. According to a phone message from McCullough to Dr. Kohl, Dr. Polston told McCullough she was "out of options"; he prescribed a TENS[7] unit for life in April 2006. Dr. Kohl's notes recorded a conversation she had with Dr. Polston in which he indicated he thought McCullough's pain response was "at this point abnormal" and "[p]robably the only thing that will get her back to function" was dealing with the psychological aspect of her pain.

The parties stipulated to a second independent medical evaluation (SIME) with a psychiatrist in June 2006. The Board selected Dr. Ronald Turco to evaluate McCullough. Dr. Turco administered the MMPI-2 and compared the results to those of the earlier MMPI-2; he said McCullough "produced practically an identical profile" in the two tests. Dr. Turco's diagnoses differed somewhat from the other psychiatrists': he made no diagnosis on Axis I, which he qualified by saying he "would have no disagreement with anyone making" a pain disorder diagnosis, observing that this diagnosis "is consistent with embellishment of symptoms or hysterical magnification." On Axis II he identified "[s]ubstantial somatoform features . . . as well as hysterical magnification symptoms." He considered McCullough's "overall psychological functioning" to be "excellent," saying she was "not inhibited with regard to any psychiatric symptoms."

Dr. Turco gave the opinion that the work-related incident was not a substantial factor in causing McCullough's chronic pain complaints or any disability she might have; instead, he thought "she has developed a degree of infantilism and has maintained physical symptoms as a way of dealing with personal issues consciously or

---

[7]     TENS stands for transcutaneous electrical nerve stimulation.

unconsciously." He was critical of the counseling McCullough had received and thought all of her medications should be discontinued. He saw no reason she could not return to her former work, thought she was medically stable, and suggested she might have "developed a lifestyle of disability and 'illness as a way of life' not associated with a 'true injury.' "

In June 2007 McCullough asked Dr. William Campbell to perform a psychological evaluation of her for purposes of a permanent partial impairment (PPI) rating. Dr. Campbell diagnosed her with chronic pain disorder and PTSD on Axis I; on Axis II he noted "[h]istrionic personality traits." Dr. Campbell's assessment says McCullough "experienced being hit as a trauma" and that "being hit scared her and shocked her." He also wrote, "The events in April, 2002 shattered her fragile view of the world. This abrupt disillusionment has caused significant regression and psychological distress. Ms. McCullough expresses much of this distress through somatic symptoms, primarily chronic back pain." Dr. Campbell concluded his report as follows: "She has made little progress in several years of medical and psychiatric treatment. Powerful characterologic and secondary gain factors will tend to reinforce regression and illness behavior. Her prognosis is poor."

The following month McCullough saw Dr. David Mulholland for a rating of her physical complaints. Dr. Mulholland diagnosed a "[s]ubluxation complex" with spasms and pain, as well as myofascitis. He assigned a ten percent whole person impairment and said McCullough "appeared to have suffered a considerable impairment due to this injury."

Job Ready provided Dr. Campbell's evaluation to Dr. Glass, who wrote a follow-up report and discussed Dr. Campbell's PTSD diagnosis at his deposition. Dr. Glass had multiple disagreements with the diagnosis. Dr. Turco later reviewed Dr. Campbell's psychiatric evaluation at the request of Job Ready's attorney and wrote

a letter commenting on it. Dr. Turco thought the PTSD diagnosis was "a far-fetched consideration" and "not in the realm of believability" from his perspective. Dr. Turco agreed with Dr. Glass that McCullough did not meet the first diagnostic category for PTSD, which he described as an actual or threatened death or serious injury.[8]

Three of McCullough's healthcare providers wrote letters in support of her workers' compensation claim. Dr. Polston wrote to document her disability, but he did not say anything about causation. The record contains post-hearing medical records related to McCullough's continuing health complaints.

C.    **Claim History And Board Proceedings, Including The First Hearing**

Job Ready paid temporary total disability (TTD) through October 10, 2002. In December 2002 Job Ready paid PPI for a five percent whole person impairment based on Dr. Fechtel's rating. Job Ready did not controvert medical benefits until April 2004, after Dr. Fechtel concluded McCullough "should be weaned from physical therapy and medications."

McCullough filed her first written workers' compensation claim in April 2004, seeking continuing TTD, PPI "when applicable," specific medical and transportation costs, a rate adjustment, penalties and interest, and costs.[9] She filed a second claim in January 2005, seeking essentially the same benefits. The parties had

---

[8]    The corresponding requirement in the DSM-IV-TR is "the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION, TEXT REVISION (DSM-IV-TR) 467 (4th ed. 2000).

[9]    She was not represented by an attorney, but at times Barbara Williams, a non-attorney representative, represented her. Williams was later appointed a limited guardian for purposes of assisting McCullough with her workers' compensation claim.

engaged in motion practice related to discovery and releases even before the claims were filed.

The extensive record in this case shows a number of procedural and discovery disputes. Of possible relevance to this appeal, in October 2007 the Board permitted Job Ready's attorney to contact the SIME directly with follow-up questions related to Dr. Campbell's evaluation and Dr. Glass's supplemental report.

The parties scheduled a hearing on McCullough's written claims over four days in December 2007, with the length of each day's proceeding limited to mornings to accommodate McCullough's condition. McCullough presented a number of lay witnesses who described the change in her behavior after the work-related incident; they testified that McCullough was an energetic, outgoing person who now was unable to perform many activities of daily life and was in constant pain. McCullough also presented testimony from a Kenai police officer; Dr. Campbell; Sabrina Johnson, the child's Special Olympics swim coach; Officer Johnson, who investigated the original incident; and a witness to a later encounter between the child's mother and McCullough. McCullough tried to subpoena the parents and their son to testify at the hearing, but she "was unable to effect service on [them]." McCullough also testified on her own behalf. Job Ready presented hearing testimony from the adjuster and Dr. Turco as well as deposition testimony from Drs. James, Kohl, Beard, Fuller, and Glass. The depositions of the parents and Officer Johnson were also in the record.

Dr. Turco generally testified consistently with his report. He explained that people with somatoform disorders "have experiences in their life and they don't deal with them and this material gets buried and rather than having an emotional experience, they have an experience where they focus on something associated with pain . . . or a physical event." That specific event then "becomes the . . . focus of everything associated with their own . . . feelings about their life." Dr. Turco testified he had reviewed Officer

Johnson's report about the incident, which "raise[d] the issue of total fabrication" by McCullough. Dr. Turco indicated his work treating PTSD began in 1970 when he was in the military and had continued to that time. In his experience a PTSD diagnosis is "usually associated with severe trauma and, most often, repetitive trauma"; he found no evidence of PTSD in either McCullough's history or psychological testing.

On cross-examination Dr. Turco testified that he would not change his opinion if McCullough had a mark on her body the night of the incident or if she was upset that night. McCullough cross-examined Dr. Turco about the MMPI-2 and the diagnostic criteria for PTSD. McCullough attempted to impeach both Dr. Turco's and Officer Johnson's credibility.

In her 2007 opening statement, McCullough said she hoped to prove that her injuries "arose as a direct result of being hit from behind and being called a pushy broad." In closing McCullough detailed the many ways her life had changed since the events of April 2002 and expressed gratitude to Social Security for finding her disabled.[10] She denied being obsessive about her case. She pointed out inconsistencies in the parents' testimony and described the distress she felt when discussing the incident with others. She argued that Officer Johnson's testimony should be given little weight because of her attempts to impeach him. She reiterated her statement, made to Dr. Turco, that the father "had to have meant for [the slap] to hurt" but she hoped that he "did not mean to hurt [her]." She characterized the father as "someone who has low social skills." She also attacked the EIME and SIME physicians, alleging they "are not held to the same standards as a treating doctor" and arguing their opinions should be accorded little weight.

---

[10] Social Security determined she was disabled as of April 8, 2002. Her disabling condition was a somatoform disorder; the psychologist who testified at the Social Security hearing said there was "a large, if not complete, psychological component to [McCullough's] complaints."

Job Ready acknowledged that McCullough "had an incident" at work, said it was "not a significant incident," and argued she had failed to attach the presumption of compensability for a physical injury. Job Ready questioned McCullough's litigation tactics and contended that many of the allegations she made about the parents were irrelevant to the workers' compensation case. Job Ready took the position that McCullough's claim of disability was "almost beyond belief."

D. **First Board Decision And Commission Appeal**

In March 2008 the Board decided that McCullough's continuing need for medical treatment and her disability were not compensable because she had not carried her burden of showing on a more probable than not basis that the April 8, 2002 incident was a substantial factor in causing her somatoform disorder. It gave the most weight to Dr. Turco's opinion because he was the Board's expert. The Board observed that "all doctors agree that there is absolutely no objective evidence in the record to support the employee's subjective complaints." The Board quoted extensively from testimony in its decision.

About two weeks after the Board decision, McCullough filed a petition to reconsider or modify it. She also filed a number of documents, including some letters of recommendation from former colleagues, as well as a recording of a conversation she had with a retired Trooper about Officer Johnson's work. The Board wrote a letter to McCullough on April 28, informing her that her reconsideration request was "considered denied" and that it would "not be acting on" the modification request.

McCullough appealed to the Commission in May 2008. Her points on appeal were lengthy and included allegations of Board errors in "rushing the claimant" and "failing to apply common sense." The Commission affirmed the Board's decision, finding that the Board "acted reasonably in concluding that McCullough failed to meet her burden of proving her claim by a preponderance of the evidence."

## E.  Appeal To This Court And Stay

McCullough appealed the Commission's decision to this court in 2011.  In December 2011 McCullough asked us to supplement the record with new evidence showing, in her view, that two witnesses had not been truthful in their testimony.  She attached copies from a criminal court file related to a domestic violence incident in the child's household between the mother and son.  McCullough alleged this evidence undercut the parents' credibility about the force of the work-related slap.  We denied her motion and instructed her to return to the Board to reopen her case if she wanted the material considered.  She then sought a stay so she could do so.  We granted her request "in an abundance of caution to avoid unnecessary duplication of effort."

## F.  Second Board Hearing, Board Decision, And Commission Decision

McCullough promptly filed a petition with the Board to reopen her case and consider new evidence; she also filed a new workers' compensation claim.  Job Ready filed a petition to dismiss McCullough's workers' compensation claim and opposed the petition to reopen the case.

In 2012 the Board held a hearing on the petition to dismiss and denied it.  The following year the Board held a hearing on the merits of the modification petition.  McCullough filed a 241-page pre-hearing brief.  The hearing officer asked McCullough to break her arguments into two categories:  those related to newly discovered evidence and those related to incorrect factual findings in the original decision.  McCullough pointed out several examples of what she considered errors in the first decision, such as the Board's attribution of a statement to a doctor, when in fact the doctor merely agreed with a statement made by Job Ready's attorney.  More than once the hearing chair tried to steer McCullough's focus to the legal relevance of the mistakes she had identified.  McCullough ultimately agreed with the chair that her argument was that all of the factual errors together would be enough to reverse the first decision.

The hearing chair asked McCullough to demonstrate the force of the slap by striking the wall, which McCullough refused to do in part because it would not show the same type of movement as hitting a person. McCullough tried to use information from the son's criminal case to argue that the parents' deposition testimony was not credible. McCullough also wanted the Board to consider as new evidence her affidavit about a conversation she had at the airport with the chair of the 2007 hearing, in which he allegedly told McCullough the initial decision was flawed. The Board refused to consider this evidence because it was hearsay and the hearing officer had died before the 2013 hearing. She also asked the Board to consider other pieces of "new evidence" that were not in fact new, including letters of recommendation from the 1990s and a picture of the gate at the child's house.

The Board wrote a detailed decision in which it listed specific allegations of error and its response to them. The Board decided that it could consider and reweigh all the evidence when making the modification decision, but it only ordered corrections to minor errors in the initial decision and otherwise denied McCullough's modification petition.

McCullough again appealed to the Commission. The Commission affirmed the Board's denial of the modification, concluding that substantial evidence in the record supported the Board's decision that McCullough was not disabled as a result of the 2002 work-related incident. McCullough again appealed to this court. Both decisions are now at issue.

## III. STANDARDS OF REVIEW

In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision rather than the Board's.[11] We independently review the Commission's conclusion that substantial evidence in the record supports the Board's factual findings by independently reviewing the record and the Board's findings.[12]

## IV. DISCUSSION

McCullough mounts multiple attacks on the Board's findings, the EIME and SIME process, witnesses and their credibility, and the fairness of Board proceedings in general and of the hearing officers who presided over her hearings in particular. Her main arguments appear to be that (1) the evidence supporting the Board's findings is not substantial and (2) the hearing officers were biased against her. At times she claims she was denied due process, but those claims appear to be related to her perceptions of unfairness in the hearing process or of bias by Dr. Turco. Some of her concerns, such as her allegations about copyright infringement, are not relevant to the proceedings or the appeal. We thus examine the two questions we have identified.

### A. The Commission Correctly Concluded That Substantial Evidence In The Record Supported The Board's Decisions.

The Commission decided that substantial evidence in the record supported the Board's decisions in both the initial denial of benefits and the denial of the modification petition. We agree.

---

[11] *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1125 (Alaska 2008)).

[12] *Id.*

Because McCullough's injury happened in 2002, the pre-2005 presumption analysis applies to her claim.[13] That analysis had three possible steps.[14] At the first step the employee had to attach the presumption of compensability with a preliminary link between her disability and her employment.[15] If the presumption attached, the burden shifted to the employer to offer substantial evidence that either (1) provided an alternative explanation that, if believed, would exclude work-related factors as a substantial cause of the disability or (2) directly eliminated any reasonable possibility that employment was a factor in causing the disability.[16] An employer could rebut the presumption by presenting a qualified expert who testified that, in his opinion, a claimant's work was not a substantial factor in causing her disability.[17] At the first two stages, the Board considered each party's evidence in isolation, without weighing it.[18] If the employer rebutted the presumption, the presumption dropped out and the burden shifted back to the

---

[13]     *See* Ch. 10, § 78, FSSLA 2005.

[14]     *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000) (citing *Osborne Constr. Co. v. Jordan*, 904 P.2d 386, 389 (Alaska 1995)).

[15]     *Steffey v. Municipality of Anchorage*, 1 P.3d 685, 690 (Alaska 2000) (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 624 (Alaska 1996)).

[16]     *Tolbert v. Alascom, Inc.*, 973 P.2d 603, 611 (Alaska 1999) (quoting *Williams v. State, Dep't of Revenue*, 938 P.2d 1065, 1072 (Alaska 1997)).

[17]     *Steffey*, 1 P.3d at 691.

[18]     *See Tolbert*, 973 P.2d at 611; *Stephens*, 915 P.2d at 624.

employee to prove her claim by a preponderance of the evidence.[19] At the third stage the Board weighed the evidence.[20]

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[21] When causation was an issue, the employee was required to prove that the work-related injury was "a substantial factor" in causing the disability or need for medical treatment.[22] The "substantial factor" test had two parts: to prevail, the employee had to show both that the disability would not have happened "but for" the injury and that "reasonable persons would regard the injury as a cause of the disability and attach responsibility to it."[23]

Job Ready does not appear to contest that McCullough attached the presumption. It is not entirely clear whether McCullough contends that Job Ready failed to rebut the presumption. Because she is pro se and because she in essence argues that the evidence the Board relied on was not substantial, we consider whether the Board's finding that Job Ready rebutted the presumption is supported by substantial evidence. We agree with the Commission that substantial evidence supports the Board's findings. The first decision relied on the reports of Drs. Turco, Glass, Bell, and Fuller to find that Job Ready rebutted the presumption. All of those reports provided an alternative explanation

---

**19** *Tolbert*, 973 P.2d at 611 (quoting *La. Pac. Corp. v. Koons*, 816 P.2d 1379, 1381 (Alaska 1991)).

**20** *Stephens*, 915 P.2d at 627.

**21** *Steffey*, 1 P.3d at 689 (quoting *Thompson v. United Parcel Serv.*, 975 P.2d 684, 688 (Alaska 1999)).

**22** *Id.* at 690.

**23** *Doyon Universal Servs. v. Allen*, 999 P.2d 764, 770 (Alaska 2000) (citing *Fairbanks North Star Borough v. Rogers & Babler*, 747 P.2d 528, 532 (Alaska 1987)).

that, if believed, would exclude work-related factors as a substantial cause of McCullough's disability and need for medical treatment.

With respect to the physical complaints, Drs. Bell and Fuller could find no "organic musculoskeletal pathology to support her subjective claims of pain"; they relied on their own physical examination, the multiple imaging studies, and reports of other "neurological, orthopedic, and physiatry specialists" to support this statement. Because of the lack of any identifiable physical condition, these doctors gave the opinion that McCullough had no need of continuing medical care stemming from the work-related incident and that she was not disabled from doing her usual work as a result of it. In their opinion, McCullough had "the physical capacities to return to her job as an activity therapist"; in fact, they thought she had no physical limitations, even for heavy work. They additionally said McCullough had no PPI related to the injury. They deferred to Dr. Glass for the psychological questions.

Drs. Glass and Turco, both psychiatrists, addressed the psychological components of McCullough's condition. Neither doctor thought McCullough was disabled or in need of further medical or psychological treatment as a result of the work-related incident. They identified her personality or "[p]ersonality psychodynamics" as the cause of her condition. These opinions were based on interviews with McCullough, results of psychological testing, and the doctors' review of medical records. The doctors' opinions are substantial evidence that rebut the presumption.

At the third stage, McCullough had the burden of persuading the Board that, on a more probable than not basis, the work-related incident was a substantial factor in causing her need for continuing medical care and any disability she had.[24] At this stage,

---

[24]    *Cowen v. Wal-Mart*, 93 P.3d 420, 426 (Alaska 2004).

the Board is tasked with deciding which evidence it finds more persuasive.[25] The Board, by statute, "has the sole power to determine the credibility of a witness."[26] On appellate review, we do not reweigh the evidence or choose between competing inferences.[27] In assessing whether substantial evidence in the record supports the Board's decision, we look to see whether the evidence exists.[28] As we have said many times, "if the Board is faced with two or more conflicting medical opinions — each of which constitutes substantial evidence — and elects to rely upon one opinion rather than the other, we will affirm the Board's decision."[29]

Here, the first Board decision gave the most weight to Dr. Turco's opinion that McCullough did not have a psychological condition but that her complaints were related to underlying personality dynamics, and the second decision did not modify this finding. Because Dr. Turco's opinion was substantial evidence that rebutted the presumption, it was also sufficient evidence to support the Board's finding that McCullough's disability and any need for continuing medical treatment were not compensable.[30]

---

[25] *See id.*

[26] AS 23.30.122.

[27] *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1179 (Alaska 2014).

[28] *Cowen*, 93 P.3d at 424.

[29] *Doyon Universal Servs.*, 999 P.2d at 767-68 (quoting *Yahara v. Constr. & Rigging, Inc.*, 851 P.2d 69, 72 (Alaska 1993)).

[30] *See Cowen*, 93 P.3d at 426 (noting that evidence sufficient to rebut the presumption was also sufficient to support Board's decision).

McCullough argues that Dr. Kohl should not have been included in the list of her doctors who agreed with the EIME panel reports, at least with respect to causation. She is correct. Dr. Kohl agreed with the report except for its conclusion that McCullough's condition was not work related. But this error is harmless. The Board's determination that Job Ready rebutted the presumption is supported by the other evidence it cited — the EIME panel's opinions, Dr. Turco's opinion, and the opinions of Dr. James and Dr. Beard. Because the Board relied on other substantial evidence besides Dr. Kohl's opinion to make its finding, its error did not affect McCullough's substantial rights.[31]

McCullough maintains that the numerous statements by the EIME and SIME physicians that no objective evidence supports her physical complaints are incorrect, rendering their opinions not substantial. We have examined the examples she cites and find no merit in her argument. At her deposition Dr. Kohl testified there were "no objective findings, other than the fact that [McCullough] winces when you touch that area" and answered affirmatively when asked if she agreed with the EIME panel report except for "the psychiatric conclusion that it's not work related." Dr. Kohl testified she did not doubt McCullough had pain but nonetheless agreed with the EIME panel that there was "no organic pathology to support the subjective complaints." And Dr. Kohl agreed with Dr. Glass's diagnosis of pain disorder associated with psychological factors, saying it "is the exact DSM diagnosis that [she] think[s] [McCullough] has." Dr. Ihde-Scholl made the same pain disorder diagnosis. Dr. Beard and some physical therapists reported that at times McCullough sweated when touched in the area of her back associated with the pain. Dr. Beard also indicated that the sweating was possibly "related to the sympathetic nervous system" and "[t]hat part of the nervous system is, to some

---

[31]     *See Fairbanks North Star Borough v. Rogers & Babler*, 747 P.2d 528, 531 (Alaska 1987) (explaining harmless error standard and applying it to Board's presumption analysis).

degree, influenced by emotional aspects or issues." This testimony does not so detract from the other evidence in the record as to make the evidence the Board relied on not substantial.[32]

Likewise, the isolated reports of edema do not render other evidence supporting the Board's decision not substantial. Landstrom, the first healthcare provider who saw McCullough, saw no swelling in the shoulder or scapula area. As set out above, the physical therapist's notes showing edema are dated September 2002, more than four months after the work-related incident, yet the same therapist did not record edema in July. McCullough does not explain how physical contact in early April could cause edema in September but not in July. And while Dr. McCord's own review of the right-shoulder MRI suggested some asymmetry, which he thought might indicate "more fluid" and prompted him to consider discussing this impression with the doctor who reviewed the MRI, Dr. McCord's chart notes never again mentioned the possibility of edema or fluid. With respect to the trigger points, a physical therapist in September 2002 found "[n]o trigger points or point tenderness" when examining McCullough. Dr. Polston treated trigger points in 2005, but he later described McCullough's pain as "abnormal" and recommended psychological treatment for it. Again, this evidence is not adequate to persuade us that the evidence supporting the Board's decision is not substantial.

The second Board decision characterized the work-related incident as "an essentially negligible event," which suggests that the Board did not consider the incident important enough to be considered a substantial factor in causing McCullough's condition. Substantial evidence supports the Board's decision that the work-related

---

[32] *See Humphrey*, 337 P.3d at 1179 ("We 'must take into account whatever in the record detracts' from the weight of evidence when we consider whether evidence is substantial . . . ." (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011))).

incident was not a substantial factor in causing the need for further medical treatment. As the Board remarked, McCullough's chosen healthcare provider did not observe bruising or any physical sign of injury two days after the incident, making it hard to believe that the father "could have hit [McCullough] hard enough to cause such dramatic damage." Job Ready provided McCullough with two years of medical treatment related to the injury; it did not controvert medical benefits until April 2004. In spite of two years of various treatments, McCullough did not improve. Nor did she improve after an additional three years of treatments from several medical providers following the controversion. With respect to her disability claim, Drs. James and Beard both thought McCullough could return to her usual occupation. The EIME panel gave the opinion that McCullough did not meet the definition of disability in the Alaska Workers' Compensation Act. Dr. Turco said that in his opinion McCullough was able to work as an elementary school teacher or a day habilitation specialist. These opinions are substantial evidence to support the Board's decisions.

## B.     There Is No Evidence Of Hearing Officer Bias.

On appeal McCullough argues that both Board hearing chairs and the second Board panel were biased and that the second hearing officer engaged in "character assassination." "To show hearing officer bias, a party must demonstrate 'that the hearing officer had a predisposition to find against a party or that the hearing officer interfered with the orderly presentation of the evidence.' "[33]  The fact that a hearing officer decides questions adversely to a party is not in itself adequate proof of bias.[34]  The examples of bias McCullough points to include typographical errors, word choice in writing the

---

[33]     *Apone v. Fred Meyer, Inc.*, 226 P.3d 1021, 1030 (Alaska 2010) (quoting *AT & T Alascom v. Orchitt*, 161 P.3d 1232, 1246 (Alaska 2007)).

[34]     *Orchitt*, 161 P.3d at 1246.

decisions, and refusing to believe her testimony. She also takes issue with the request at the second hearing that she demonstrate the force used to slap her by hitting a wall. We see no indication that either hearing chair, or the second hearing panel, was biased against McCullough and see nothing improper with a request for a demonstration in this case. The record suggests that the hearing chair was trying to clarify McCullough's statements about how the slap happened.

McCullough points to multiple alleged errors in the Board's decisions, but she fails to demonstrate how the errors, to the extent they exist, are legally relevant to the issues in this appeal. The central question on appeal is whether substantial evidence supports the Board's findings that her work-related injury was not a substantial factor in her current disability and need for medical treatment. We hold that the Commission correctly concluded that substantial evidence in the record supports the Board's findings.

## V.    CONCLUSION

We AFFIRM the Commission's decisions.